1    Scott B. Henrie, WSBA #12673                          The Honorable Timothy W. Dore
     WILLIAMS, KASTNER & GIBBS PLLC                                            Chapter 7
2    601 Union Street, Suite 4100
     Seattle, WA  98101-2380
3    Telephone:  (206) 628-6600
     Fax:  (206) 628-6611
4    Email:  shenrie@williamskastner.com

5    ***Special Litigation Counsel for Plaintiff***
     ***Nancy James, Trustee for the Bankruptcy***
6    ***Estate of Global Baristas US, LLC***

7

8

9
                              UNITED STATES BANKRUPTCY COURT
10                            WESTERN DISTRICT OF WASHINGTON
                                        AT SEATTLE
11
     GLOBAL BARISTAS US, LLC,                      NO.  18-14095-TWD
12
               Debtor.
13
     _____
     NANCY JAMES, TRUSTEE for the                  Adversary No.
14   BANKRUPTCY ESTATE OF GLOBAL
     BARISTAS US, LLC                              COMPLAINT TO AVOID
15                                                 TRANSFERS UNDER BANKRUPTCY
               Plaintiff,                          CODE § § 544, 548, 550, 551 AND
16                                                 RCW 19.40 ET SEQ.
           v.
17
     MICHAEL J. AVENATTI,
18
               Defendant.
19

20
             Nancy James ("Trustee"), in her capacity as Chapter 7 Trustee of the bankruptcy estate
21
     of Global Baristas US, LLC, by and through her attorneys, Williams, Kastner & Gibbs PLLC,
22
     for the benefit of creditors of the above-captioned bankruptcy estate, seeks to avoid transfers of
23
     the debtor's property interests to or for the benefit of the above-named defendant, Michael J.
24
     Avenatti.
25

     COMPLAINT TO AVOID TRANSFERS UNDER BANKRUPTCY         **Williams, Kastner & Gibbs PLLC**
     CODE § § 544, 548, 550, 551 AND RCW 19.40 ET SEQ. - 1   601 Union Street, Suite 4100
                                                             Seattle, Washington 98101-2380
                                                             (206) 628-6600
     6812952.1

# I. JURISDICTION AND VENUE

1.1 This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(C), (E), (H), (K) and/or (O).

1.2 This Court has jurisdiction to hear this complaint pursuant to 28 U.S.C. §§ 157(a) and (b), 1334(a) and (b), and 11 U.S.C. §§ 105, 544, 548, 550 and 551.

1.3 This matter has been referred to the Bankruptcy Judges of the District pursuant to General Rule 7 of the Rules for the United States District Court for the Western District of Washington.

1.4 Venue is proper under 28 U.S.C. § 1409.

# II. PARTIES

2.1 <u>Debtor.</u> The Involuntary Chapter 7 Bankruptcy Petition was filed on, October 10th, 2018. On November 30, 2019, the Bankruptcy Court entered an Order for Relief and Judgment Granting the Petition for Involuntary Chapter 7.

2.2 <u>Trustee.</u> Nancy James (the "Trustee") was appointed Chapter 7 Trustee of the Global Baristas US, LLC bankruptcy estate. The Trustee is authorized to bring this action pursuant to 11 U.S.C. §§ 105, 544, 548, 550 and 551, and does so solely in her capacity as Trustee for the bankruptcy estates.

2.3 Michael J. Avenatti (hereinafter "Avenatti") is a resident of California.

# III. FACTS

A. <u>Assignment of rights in King County Superior Court Case</u>

3.1 On April 21, 2017 both Global Baristas US, LLC and Global Baristas, LLC assigned any and all rights, claims, defenses, appellate rights, rights to fees, compensation, potential judgments, and or causes of action associated with King County Superior Court case number 15-2-27043-5 SEA to Michael J. Avenatti personally. That Assignment is attached as **Appendix A**.

COMPLAINT TO AVOID TRANSFERS UNDER BANKRUPTCY
CODE §§ 544, 548, 550, 551 AND RCW 19.40 ET SEQ. - 2

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6812952.1

3.2     The only consideration offered in exchange by Avenatti was a personal commitment to provide up to $500,000 to the meet the business obligations of Global Baristas US, LLC and Global Baristas, LLC.

3.3     The only person who signed the assignment was Avenatti. Avenatti signed the assignment in his alleged capacity as general counsel for Global Baristas US, LLC and as general counsel for Global Baristas, LLC. Avenatti then signed the assignment in his personal capacity.

3.4     Avenatti was then the principal owner and CEO of Global Baristas US, LLC which operated Tully's coffee stores. Avenatti owns Avenatti &Associates, APC, which owns 100 percent of Doppio Inc., which in turn owns 80% of Global Baristas, LLC which owns 100% of Global Baristas US, LLC.

3.5     Avenatti's personal promise to pay up to $500,000 to meet the business obligations of Global Baristas US, LLC and Global Baristas, LLC was insufficient consideration and was in fact worthless.

3.6     Global Baristas US, LLC, Global Baristas, LLC and Avenatti were insolvent at the time of the assignment.

3.7     The factual allegations in the Motion for Appointment of a Receiver in *In re Eagan Avenatti LLP*, Debtor, in the United States District Court in the Central District of California, Case No. 8:18-CV 01644-VAP-KES attached hereto as **Appendix B** are incorporated herein as if fully set forth.

3.8     As reflected in the Motion for Appointment of a Receiver, to the extent funds were transferred to either of Global Baristas US, LLC and/ or Global Baristas, LLC through Avenatti's efforts, those transfers were themselves fraudulent transfers from Avenatti's law firm, Egan Avenatti LLP.

COMPLAINT TO AVOID TRANSFERS UNDER BANKRUPTCY
CODE § § 544, 548, 550, 551 AND RCW 19.40 ET SEQ. - 3

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6812952.1

Case 18-14095-TWD    Doc 61    Filed 04/12/19    Ent. 04/12/19 12:10:50    Pg. 3 of 103

3.9     The factual allegations contained in the Grand Jury Indictment in *United States of America v. Michael John Avenatti* in the United States District Court for the Central District of California, Southern Division, Case No. SACR19-00061 JVS (April 10, 2019) for violations of among other statutes, Title 18, U.S.C. §1343 and §1344(1) (bank fraud and wire fraud), attached hereto as **Appendix C** are incorporated herein as if fully set forth.

3.10    As reflected in the Grand Jury Indictment, funds transferred to Global Baristas US, LLC and Global Baristas, LLC were part of funds improperly diverted by Avenatti from an Eagan Avenatti LLP client trust accounts for Avenatti's own purposes.

3.11    As further reflected in the attached Grand Jury Indictment, Avenatti took affirmative actions to obstruct IRS collection activities relating to Global Baristas US, LLC's unpaid payroll taxes by, among other things, lying to an IRS officer, changing contracts, merchant accounts,  and bank account information to avoid liens and levies imposed by the IRS including instructing employees to deposit over $800,000 in cash from Tully's stores, owned and operated by Global Baristas US, LLC, into a bank accounts associated with different entities.

3.12    All such transfers from Avenatti or Eagan Avenatti LLP only served to expose Global Baristas US, LLC to further liability for the avoidance of those transfers.

3.13    The Global Baristas US, LLC and Global Baristas, LLC assignment to Avenatti was made pursuant to a fraudulent scheme to conceal and obstruct creditors and with intent to hinder, delay and or defraud creditors of Global Baristas US, LLC.

## IV.  CAUSES OF ACTION

4.1     The assignment by the debtor to Avenatti described above and attached as Appendix A is voidable under Bankruptcy Code § 547, § 548 and/or under the Uniform Fraudulent Transfer Act, RCW 19.40 et seq., made applicable to these proceedings by 11 U.S.C. § 544.

COMPLAINT TO AVOID TRANSFERS UNDER BANKRUPTCY
CODE § § 544, 548, 550, 551 AND RCW 19.40 ET SEQ. - 4

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6812952.1

1     4.2     It is anticipated that discovery will reveal additional avoidable transfers as

2    alleged in the Grand Jury Indictment.

3                  V.  <u>PRAYER FOR RELIEF</u>

4        Having alleged causes of action to avoid transfers from the Debtor to or for the benefit

5    of the defendant, plaintiff Nancy James, solely in her capacity as Chapter 7 Trustee, PRAYs

6    FOR RELIEF as follows:

7        5.1     For avoidance of the assignment identified as Appendix A and for such other

8    voidable transfers as are identified through discovery;

9        5.2     For a judgment in the amount of the value of the voidable transfers received by

10    or for the benefit of the defendant;

11        5.3     For a judgment in the amount of the voidable transfers received directly or

12    indirectly by the defendant as a result of these transfers or for which defendant was the

13    intended beneficiary;

14        5.4     For an order preserving all transfers avoided hereunder for the benefit of the

15    Estate; and

16        5.5     For such other and further damages and equitable relief as is allowed under 11

17    U.S.C. § 550, and as the Court deems just and appropriate.

18        DATED this 12th day of April, 2019.

19

20                        <u>/s/ Scott B. Henrie, WSBA #12673</u>
                           Scott B. Henrie, WSBA #12673
                           Attorneys for Plaintiff Nancy James, as Chapter

21                         7 Trustee of Global Baristas US, LLC.
                         WILLIAMS, KASTNER & GIBBS PLLC

22                         601 Union Street, Suite 4100
                         Seattle, WA 98101-2380

23                         Telephone: (206) 628-6600
                         Fax: (206) 628-6611

24                         Email: shenrie@williamskastner.com

25

COMPLAINT TO AVOID TRANSFERS UNDER BANKRUPTCY
CODE § § 544, 548, 550, 551 AND RCW 19.40 ET SEQ. - 5

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6812952.1

1

## PROOF OF FILING AND SERVICE

The undersigned hereby certifies that on April 12, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants.

DATED this 12th day of April, 2019.

/s/ Scott B. Henrie, WSBA #12673
Scott B. Henrie, WSBA #12673
Attorneys for Plaintiff Nancy James, as Chapter
7 Trustee of Global Baristas US, LLC.
WILLIAMS, KASTNER & GIBBS PLLC
601 Union Street, Suite 4100
Seattle, WA  98101-2380
Telephone:  (206) 628-6600
Fax:  (206) 628-6611
Email: shenrie@williamskastner.com

COMPLAINT TO AVOID TRANSFERS UNDER BANKRUPTCY
CODE § § 544, 548, 550, 551 AND RCW 19.40 ET SEQ. - 6

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6812952.1

## ASSET ASSIGNMENT AGREEMENT

This Asset Assignment Agreement ("Agreement") is entered into by and between Global Baristas US, LLC and Global Baristas, LLC (collectively "Global") and Michael J. Avenatti, an individual ("Avenatti"), and is effective as of the last date of execution set forth below. Global and Avenatti may be collectively referred to herein as the "Parties".

WHEREAS, pursuant to this Agreement it is the intention of Global to transfer and vest all rights, title ownership and interests in various assets to Avenatti in exchange for the consideration described herein; and

NOW THEREFORE, in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.    The recitals set forth above are true and accurate and are an integral part of this Agreement.

2.    Global hereby irrevocably assigns and transfers to Avenatti any and all rights, claims, defenses, appellate rights, rights to fees, compensation, potential judgments, costs and/or causes of action held by Global and associated with King County Superior Court case number 15-2-27043-5 SEA to Avenatti (the "Assets"). Avenatti hereby accepts the irrevocable assignment and transfer of the Assets made by Global and agrees to execute this Agreement.

3.    Global agrees to execute any and all additional documents and agreements that may be necessary to consummate this assignment of the Assets and to facilitate transfer of ownership of the Assets to Avenatti.

4.    Avenatti, for and in consideration of the assignment and transfer of ownership of the Assets as well as the promises and conditions contained herein, hereby agrees to provide up to $500,000.00 to meet the business obligations of Global as requested from time to time by Global during the time period May 1, 2017 to October 31, 2018.

5.    Global, for and in consideration of the promises and conditions contained herein represents that it is the sole and exclusive owner of the Assets, that the Assets are not subject to any encumbrance that would prevent their transfer, that it has the authority to enter into this Agreement and, it hereby agrees to release, remit, remise and forever discharge Avenatti, its officers, directors, shareholders, representatives, agents, attorneys and assigns, from any and all claims that may exist between them including, civil actions, arbitration claims, tort claims, statutory claims, administrative claims, causes of action, claims at law and choses in equity, known or unknown, directly or indirectly relating to the respective businesses of the Parties, and any and all other matters whatsoever from the date of execution below back to the beginning of time.

6.    The invalidity of any portion of this Agreement shall not affect the validity of any other provision. In the event that any provision of this Agreement is held to be invalid, the Parties agree that the remaining provisions shall remain in full force and effect.

1

7.    This Agreement reflects the complete agreement between the Parties regarding the subject matter identified herein and shall supersede all other agreements, either oral or written, between the Parties regarding such subject matter. The Parties stipulate that neither of them, nor any person acting on their behalf has made any representation except as is specifically set forth in this Agreement and each of the Parties acknowledges that they have not relied upon any representation of any third party in executing this Agreement, but rather have relied exclusively on their own judgment in entering into this Agreement.

9.    This Agreement shall be governed by and construed solely and exclusively in accordance with the laws of the State of California without regard to any statutory or common-law provision pertaining to conflicts of laws. The Parties agree that courts of competent jurisdiction in Los Angeles, California, shall have jurisdiction with regard to any action arising out of any breach or alleged breach of this Agreement. The Parties agree to submit to the personal jurisdiction of such courts and any other applicable court within the State of California.

10.    This Agreement may be executed in counterparts, each of which shall be deemed an original for all intents and purposes.

11.    The Parties to this Agreement declare and represent that:

    a.    They have read and understand this Agreement;

    b.    They have been given the opportunity to consult with an attorney if they so desire;

    c.    They intend to be legally bound by the promises set forth in this Agreement and enter into it freely, without duress or coercion;

    d.    They have retained signed copies of this Agreement for their records; and

    e.    The rights, responsibilities and duties of the Parties hereto, and the covenants and agreements contained herein, shall continue to bind the Parties and shall continue in full force and effect until each and every obligation of the Parties under this Agreement has been performed.

[remainder of page intentionally left blank]

2

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates set forth below.

Dated: April 21, 2017

Global Baristas US, LLC

By: _____
Michael Avenatti, General Counsel

Dated: April 21, 2017

Global Baristas, LLC

By: _____
Michael Avenatti, General Counsel

Dated: April 21, 2017

_____
Michael J. Avenatti

3

## APPENDIX B - Pg. 1

Scott H. Sims, State Bar No. 234148
Andrew D. Stolper, State Bar No. 205462
FRANK SIMS & STOLPER LLP
19800 MacArthur Boulevard, Suite 855
Irvine, California 92612,
Telephone:      (949) 201-2400
Facsimile:      (949) 201-2401
astolper@lawfss.com
ssims@lawfss.com

Attorneys for Judgment Creditor
JASON FRANK LAW, PLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

In re

EAGAN AVENATTI, LLP,

Debtor.

Case No.  8:18-CV-01644-VAP-KES

**JUDGMENT CREDITOR JASON FRANK LAW, PLC'S NOTICE OF MOTION AND MOTION FOR APPOINTMENT OF RECEIVER AND RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

*[Declarations of Jason M. Frank and Brian Weiss and [Proposed] Order filed concurrently herewith]*

**DATE: March 12, 2019**
**Time:          10:00 a.m.**
**Courtroom:     6D**

-1-

MOTION FOR APPOINTMENT OF
RECEIVER

**APPENDIX B - Pg. 2**

1
2

### NOTICE OF MOTION FOR APPOINTMENT OF RECEIVER AND RESTRAINING ORDER

3    PLEASE TAKE NOTICE THAT on March 12, 2019 at 10:00 a.m., or as soon thereafter as

4    counsel may be heard in Courtroom 6D of the above-entitled Court, located at 411 West Fourth

5    Street, Santa Ana, California 92701, Judgment Creditor Jason Frank Law, PLC ("JFL") will and

6    hereby does move this Court for an Order (1) appointing a receiver ("Receiver") to take over the

7    management and control of Judgment Debtor Eagan Avenatti LLP ("EA") and to take possession of

8    its assets; (2) setting forth the rights, duties and compensation of the Receiver as provided in the

9    [Proposed] Order lodged and served concurrently herewith; and (3) requiring EA to turnover to the

10   Receiver its bank accounts, client trust accounts, property, keys, books, documents and records

11   relating to the firm and to refrain from interfering in any manner with the discharge of the Receiver's

12   duties and dissipation of EA's assets as set forth in greater detail in the [Proposed] Order filed

13   concurrently herewith.  JFL nominates Brian Weiss to serve as the Receiver.

14   This Motion is made pursuant to Federal Rule of Civil Procedure 66 and 69(a) and California

15   Code of Civil Procedure §§564(3), 564(4), 708.520 and 708.620.   JFL obtained entry of Judgment

16   against EA on May 22, 2018 in the sum of $10,000,000 plus post-judgment interest and reasonable

17   attorneys' fees and costs incurred in the collecting the judgment (the "Judgment.")  EA has not made

18   any payments toward the Judgment and has not indicated any willingness to make voluntary

19   payments on the Judgment.

20   As set forth below, EA has numerous contingency cases as well as accounts receivable owed

21   to it by various clients and companies and other unknown tangible and intangible assets, including

22   potentially recoverable fraudulent transfers.  The appointment of a Receiver is necessary to take

23   possession and control of these and other assets in order to facilitate the fair and orderly satisfaction

24   of the Judgment. A restraining order is necessary to ensure EA cooperates with the receiver and does

25   not further dissipate EA's assets.

26   This Motion is based on this notice of motion and motion, the attached Memorandum of

27   Points and Authorities, the Declarations of Jason M. Frank and Brian Weiss filed concurrently

28   herewith, the [Proposed] Order, the pleadings and records on file herein and in the related bankruptcy

-2-

MOTION FOR APPOINTMENT OF RECEIVER

**APPENDIX B - Pg. 3**

file for In re: Eagan Avenatti, LLP, Case No. 8:17-bk-11961-CB, other federal filings of which this Court may take judicial notice and such other and further argument and evidence as may be presented at the time of the hearing.

Dated: February 12, 2019                                           FRANK SIMS & STOLPER LLP

                                                       By:   /s/ Scott H. Sims
                                                             Scott Sims, Esq.
                                                             Attorneys for Judgment Creditor
                                                             Jason Frank Law, PLC

1

<u>**TABLE OF CONTENTS**</u>

2

3

4

I.      INTRODUCTION ........................................................................... 8

II.     FACTUAL BACKGROUND .......................................................... 8

        A.      The Parties.......................................................................... 8

        B.      History Of The Underlying Dispute.................................... 9

                1.      THE JFL ARBITRATION............................................. 9

                2.      EA'S BANKRUPTCY .................................................. 10

                3.      THE JFL SETTLEMENT ............................................. 10

                4.      EA'S BREACH OF THE SETTLEMENT AND THE JUDGMENT....... 11

        C.      EA's Failure To Pay Any Portion Of The Judgment and EA's Failure To Comply With Court Orders .............................................. 12

                1.      EA And Avenatti Have Failed To Produce The Financial Records, Client Information And Case Information Ordered By The Court, Among Other Records ............................................................. 12

                2.      EA Has Violated The Bankruptcy Court's Restraining Order .................. 12

        D.      EA and Avenatti Have Been Hiding EA's Assets In Undisclosed Bank Accounts Both *During* and *After* EA's Bankruptcy .......................... 15

                1.      Avenatti Set Up Undisclosed Bank Accounts After Filing For Bankruptcy ...................................................................

                        ............................................................... 13

                2.      During The Bankruptcy, Avenatti Secretly Deposited EA Fees From The NFL Super Bowl Litigation In The Undisclosed Cnb Accounts and Then Transferred The Money To His Personal Corporation AA.................................. 16

                3.      During The Bankruptcy, Avenatti Secretly Deposited EA Fees From The <u>Barela</u> Litigation Into the Undisclosed CNB Accounts and Then Transferred the Money To Pay-Off Avenatti's Personal Debts ............................................... 18

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

4.   During The Bankruptcy, EA Received *Millions Of Dollars* From Another Case EA Failed to Disclose On Its Schedule Of Assets ................................................................................................ ................................................................................................ 20

5.   During The Bankruptcy, Avenatti Received *$29 Million* In Settlement Payments Into His Undisclosed Client Trust Account at CNB and Delayed Receiving *Over $8 Million* In Fees Until <u>After</u> The Bankruptcy Dismissal ....................................................... 22

6.   Avenatti Has Diverted *Millions Of Dollars* Of EA Fees After the Bankruptcy Dismissal and Entry Of JFL's Judgment .............................. 24

7.   Avenatti Has Been Attempting to Reduce and Divert EA's Right To Attorney Fees In the Future For the Benefit of Himself and His Other Entities ....................................................................... 25

8.   EA Removes Its Furniture and Artwork After Being Evicted ................. 26

III.   THIS COURT SHOULD APPOINT A RECEIVER ....................................................... 27

    A.   Legal Standard ........................................................................ 27

    B.   The Appointment Of A Receiver Is Appropriate And Urgently Needed .............. 28

    C.   The Powers Of The Receiver ......................................................... 28

IV.   NOMINATION OF BRIAN WEISS AS RECEIVER ...................................................... 32

V.   CONCLUSION. ........................................................................................ 32

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

**APPENDIX B - Pg. 6**

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

<u>Canada Life Assur. Co. v. LaPeter</u>,

5

   563 F.3d 837 (9th Cir. 2009)..................................................................................28

6

<u>Donell v. Kowell</u>,

7

   533 F.3d 762 (9th Cir. 2008)..................................................................................27

8

<u>Legal Additions LLC v. Kowalksi</u>,

   2011 WL 3156724 (N.D. Cal. July 26, 2011)........................................................28

9

<u>Office Depot, Inc. v. Zuccarini</u>,

10

   596 F.3d 696 (9th Cir. 2010)..................................................................................27

11

**California Cases**

12

<u>City & County of San Francisco v. Daley</u>,

   16 Cal.App.4th 734 (1993)......................................................................................27

13

<u>Conaway v. Conaway</u> (1963)

14

   218 Cal. App. 2d 427 ..............................................................................................27

15

<u>Coppock v. State Bar</u>

16

   44 Cal.3d 665 (1988) ..............................................................................................15

17

<u>Gold v. Gold Realty Co.</u>,

   114 Cal. App. 4th 791 (2003)..................................................................................27

18

<u>Hamilton v. State Bar</u>

19

   23 Cal.3d 868 (1979) ..............................................................................................15

20

<u>O'Flaherty v. Belgum</u>,

21

   115 Cal.App.4th 1044 (2004)......................................................................27, 29, 30

22

**Other State Cases**

23

<u>Bahamas Surgery Center LLC. V. Kimberly-Clark Corp. *et al.*</u>,

   Case No. CV 14-8390-DMG . (Frank Decl..) ..................................................25, 29

24

25

<u>Barela v. Brock USA, LLC</u>,

   Case No. 8:15-cv-779...........................................................................................18, 19

26

<u>USACM Liquidating Trust v. Monaco</u>,

27

   2012 WL 12883959 .............................................................................................27, 28

28

-6-

MOTION FOR APPOINTMENT OF RECEIVER

### APPENDIX B - Pg. 7

**Federal Statutes**

11 U.S.C. 345, 704(8) ........................................................................................15

28 U.S.C 586 ....................................................................................................15

**California Statutes**

Cal. Civ. Code
      § 3440(b) ..................................................................................................27

Cal. Code Civ. P.
      § 564 et seq. .........................................................................................8, 27

Cal. Code Civ. P.
      § 685.070(a)(5) ...................................................................................27, 32

Cal. Code Civ. P.
      § 708.520 ..............................................................................................8, 28

Cal. Code Civ. P.
      § 708.620 .................................................................................8, 27, 29, 32

**Other Authorities**

Federal Rule of Civil Procedure 66 ...................................................................8, 27

Federal Rules of Civil Procedure Rule 69(a) ....................................................8, 27

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

## I.     INTRODUCTION

Judgment Creditor Jason Frank Law PLC ("JFL") hereby moves and requests the Court issue an Order appointing a receiver to enforce JFL's judgment against Judgment Debtor Eagan Avenatti, LLP ("EA") in the amount of $10 million, not including accrued interest and attorney fees and costs (the "Judgment").    JFL further requests the Court issue a restraining order precluding EA from interfering with the receiver and requiring EA to disclose and turn over possession of its assets, as well as the other relief set forth in the [Proposed] Order filed concurrently herewith.  JFL nominates Brian Weiss to serve as the receiver, a highly experienced receiver regularly appointed by federal and state courts.

It has now been more than eight months since the Judgment was entered and EA has not made any payments toward the Judgment.   EA and its managing partner, Michael Avenatti ("Avenatti"), have willfully failed to comply with Court orders and Avenatti is currently facing a pending contempt hearing before Judge Phillips.  EA and Avenatti have proven they have no intent to fully honor the Judgment.  Further, as the evidence below establishes, EA and Avenatti have been concealing *millions of dollars* of EA's assets in undisclosed bank accounts and client trust accounts and have been improperly and fraudulently transferring *millions of dollars* to Avenatti and his various corporate entities, as well as to third parties.  This includes brazen acts of bankruptcy fraud that have been uncovered during these post-judgment proceedings.  (See, infra, § II.D.)

The appointment of a receiver and restraining order is necessary and appropriate to ensure the Judgment is honored and to thwart further efforts by EA and Avenatti to conceal and dissipate EA's assets.  In addition, the receiver should be given the powers set forth in the [Proposed] Order filed concurrently herewith, including the power to investigate and recover fraudulent transfers to third-parties.  This request is made pursuant to Federal Rule of Civil Procedure 66 and 69(a) and California Code of Civil Procedure §§564(3), 564(4), 708.520 and 708.620, which provide for the appointment of receivers to enforce judgments and restraining orders.

## II.     FACTUAL BACKGROUND

### A.  The Parties

EA is a law firm that primarily handles contingency matters, whereby the firm only receives

-8-

1   legal fees after a case resolves in favor of EA's clients.  (Declaration of Jason Frank ("Frank Decl."),

2   ¶ 2.)  The two equity partners are Michael Eagan ("Eagan") and Avenatti.  (Id.; Case No. 8:17-bk-

3   11961-CB, Doc. 51, 161, p. 11.)  Avenatti is the managing partner and owns his equity interest

4   through his personal corporation, Avenatti & Associates, APC ("AA").  (Id.)

5        JFL is a professional law corporation owned by Jason Frank ("Frank").  (Frank Decl., ¶ 1.)

6   Frank worked as an attorney at EA from February 2009 through May 20, 2016.  (Id., ¶ 2.)  From

7   November 1, 2013 to his departure, Frank worked at EA pursuant to an independent contractor

8   agreement between JFL, Frank and EA.  (Id., ¶ 3, Ex. 1.)  Under the terms of the contract, JFL was

9   entitled to various forms of compensation, including 25% of the firm's annual profits, 20% of the

10   fees collected from Frank's clients and certain case-specific bonuses, among other compensation.

11   (Id., Ex. 1, § 3.).  JFL was also entitled to the firm's financial information, including its federal tax

12   returns and annual revenue and expense reports.  (Id., Ex. 1, § 5.)

13        **B.  History of the Underlying Dispute.**

14             1.  **The JFL Arbitration**.

15        EA failed to pay the amounts owed to JFL under the independent contractor agreement.

16   (Frank Decl., ¶ 4.)  Accordingly, in February 2016, JFL filed an arbitration demand with JAMS for

17   breach of contract.  (Id.)  JFL later added a claim for fraud after learning EA and Avenatti had been

18   misstating the firm's profits.  (Id.)  JFL resigned from the firm in May 2016.  (Id.)

19        The arbitration was scheduled to go forward on March 13, 2017.  (Frank Decl., ¶ 5.)  On

20   February 10, 2017, the three-judge arbitration panel unanimously awarded substantial issue and

21   evidentiary sanctions against EA, including a finding that EA had "acted with malice, fraud and

22   oppression by hiding its revenue numbers" and "tax returns" from JFL in violation of the

23   independent contractor agreement.  (Id., Ex. 2 at 3-4.)  The panel concluded that further evidentiary

24   sanctions were appropriate due to the "magnitude of EA's non-compliance with Panel Orders"

25   concerning its failure to produce financial records.  (Id. at 5.)   The panel also ordered Avenatti,

26   Eagan and EA's office manager, Judy Regnier, to appear for a deposition by March 3, 2017, or else

27   JFL could request further sanctions.  (Id., Ex. 3.)

28        On March 1, 2017, less than two weeks before the arbitration and two days before the

1    deposition deadline, a single creditor named Gerald Tobin with a purported claim of $28,700 filed a

2    petition to place EA into involuntary bankruptcy in the Middle District of Florida, thereby staying

3    the arbitration proceedings.  (Case No. 6:17-bk-01329-KSJ, Doc. 1.)  JFL filed an emergency motion

4    for relief from the stay.  (Id., Doc. 3).  The Florida bankruptcy court conditionally granted the motion

5    because the "involuntary case has the stench of impropriety" and questioned whether Tobin "has

6    some relationship with the firm that would have induced a collusive filing or if [EA] just got plain

7    lucky that somebody filed on the eve of the arbitration."  (Frank Decl., ¶ 6, Ex. 4.)   Notwithstanding

8    the foregoing, the court indicated the stay would remain in effect if EA voluntarily consented to being

9    placed into bankruptcy.  (Id.)

10       2.  **EA's Bankruptcy.**

11       On Friday, March 10, 2017, one court day before the arbitration, EA consented to being

12   placed into Chapter 11 bankruptcy, thereby preventing the arbitration from going forward.  (Case

13   No. 6:17-bk-01329-KSJ, Doc. 12, 13.)  The bankruptcy case was transferred to the U.S. Bankruptcy

14   Court for the Central District of California, before the Honorable Catherine E. Bauer (the

15   "Bankruptcy Court").  JFL filed a claim for approximately $14.85 million in breach of contract

16   damages and $4 million in punitive damages.  (Case No. 8:17-bk-11961-CB, Claim 8.)

17       EA filed its bankruptcy schedules on April 6, 2017.  (Case No. 8:17-bk-11961-CB, Doc. 50.)

18   Due to numerous "errors" in the schedules – including a false statement under oath that Avenatti and

19   Eagan did not receive any compensation for the last two years – EA filed amended schedules on

20   June 8, 2017.  (Id., Doc. 102-110.)  The first 341(a) Meeting of Creditors was held on June 12, 2017,

21   during which the U.S. Trustee's office noted additional problems with the amended schedules.

22   (Frank Decl., ¶ 8, Ex. 5.)  EA filed further amended schedules on July 11, 2017. (Case No. 8:17-bk-

23   11961-CB, Doc. 147-153.)  A second 341(a) Meeting of Creditors was held on July 14, 2017.  (Frank

24   Decl., ¶ 8, Ex. 6.)  EA filed 11 monthly operating reports for months of March 2017 through January

25   2018.  (Case No. 8:17-bk-11961-CB, Doc. 99, 100, 126, 162, 209, 227, 260, 294, 310, 316, 372.)

26       3.  **The JFL Settlement.**

27       In August 2017, EA, AA, Avenatti and JFL agreed to the material terms of a settlement on

28   behalf of themselves and related parties.  (Frank Decl., ¶ 9.)  The settlement was documented in a

-10-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1  written agreement dated December 12, 2017 between EA, AA, Avenatti and Eagan, on the one hand,

2  and JFL, Frank, Scott Sims ("Sims"), Andrew Stolper ("Stolper") and their law firm, Frank Sims &

3  Stolper LLP ("FSS"), on the other hand (the "Settlement").  (Id., Ex. 7.)

4       Per the terms of the Settlement, EA agreed JFL would have an approved claim of $10

5  million.  (Frank Decl., Ex. 7, § 3.1.)  However, JFL agreed it would waive collecting the full $10

6  million if EA timely paid $4.85 million in two installments: a $2 million payment due 60 days after

7  the bankruptcy dismissal, and $2.85 million due 120 days after the dismissal.  (Id., §§ 3.2, 3.5.)

8  Otherwise, JFL would be entitled to a $10 million judgment if EA failed to make the settlement

9  payments on time.  (Id., § 3.6.)  In exchange, JFL agreed it would not oppose EA's request to dismiss

10  the bankruptcy.  (Id., § 1.)

11       The Settlement was approved by the Bankruptcy Court on March 15, 2018.  (Case No. 8:17-

12  bk-11961-CB, Doc. 412.)  As part of the order, the Bankruptcy Court approved a structured dismissal

13  of EA's bankruptcy case, which required EA to pay certain debts it owed to the IRS and its

14  bankruptcy counsel prior to the dismissal totaling approximately $2,828,423.80 (the "Initial

15  Payment").  (Id., Doc. 408, 412.)  EA was not required to make its first settlement payment to JFL

16  until 60 days after the bankruptcy dismissal (on May 14, 2018).  (Frank Decl., Ex. 7, § 3.2.)

17            4.  **EA's Breach of the Settlement and the Judgment.**

18       On May 14, 2018, EA failed to make the settlement payments required under the Settlement.

19  (Frank Decl., ¶¶ 10-11.)  As a result of the default and pursuant to the terms of the Settlement, the

20  Bankruptcy Court entered a judgment against EA in the amount of $10 million plus post-judgment

21  interest and reasonable attorney fees and costs incurred in collecting the judgment on May 22, 2018

22  (the "Judgment").  (Case No. 8:17-bk-11961-CB, Doc. 445).  A Writ of Execution was issued on

23  June 6, 2018 in the amount of $10,008,465.75.  (Frank Decl., Ex. 8.)  A *secured* judgment lien in

24  that amount against EA's assets was entered with the California Secretary of State on June 7, 2018.

25  (Id., Ex. 9.)

26       The Judgment was registered before this Court on August 31, 2018.  (Doc 1.)  All

27  proceedings before the Bankruptcy Court were then transferred to this Court via a Withdrawal of

28  the Reference on October 25, 2018.  (Doc. 21.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

**C. EA's Failure to Pay Any Portion of the Judgment and EA's Failure to Comply with Court Orders.**

It has now been more than eight months since the Judgment was entered and EA has not made any payments to JFL. (Frank Decl., ¶ 13.) During the initial day of the Judgment Debtor Exam, on July 25, 2018, Avenatti testified the Judgment is "bogus" and he has not "made a determination as to what we believe should be paid relating to the judgment." (Id., Ex. 11 at 10:15 – 11:1.) Suffice it to say, EA and Avenatti have made it clear they do not intend to willingly comply with the Judgment. To that end, EA and Avenatti have blatantly violated numerous Court orders relating to the Judgment as set forth below.

**1. EA and Avenatti Have Failed to Produce the Financial Records, Client Information and Case Information Ordered by the Court, Among Other Records.**

EA and Avenatti have repeatedly failed to produce financial records, client information and case information, among other records, ordered by the Court despite numerous opportunities to comply with these orders. (Doc 48; Frank Decl., ¶ 17.) On February 4, 2019, this Court certified detailed findings of fact regarding Avenatti's failure to comply these orders and referred Avenatti to Judge Phillips to determine whether he should be held in contempt. (Id.)

**2. EA has Violated the Bankruptcy Court's Restraining Order.**

On July 11, 2018, the Bankruptcy Court issued a restraining order (the "Restraining Order") precluding EA from "assigning, encumbering or in any way transferring any proceeds, attorney's fees, costs, rights to payments and accounts receivable" that EA receives or is entitled to receive from any clients or lawsuits identified in Exhibit A to JFL's Motion for Entry of Assignment and Restraining Order (the "Cases"). (Case No. 8:17-bk-11961-CB, Doc. 498; Frank Decl., Ex. 12.) The order further required EA to file notice of receipt of any monies received from the Cases regardless of whether the payment is made to EA, AA, Avenatti or Eagan, or any entity controlled by them. (Id.)

The Bankruptcy Court issued the Restraining Order in lieu of JFL's request to have the clients send the fees directly to JFL until the Judgment is satisfied. (Frank Decl., Ex. 13 at 41:18 – 43:20.)

-12-

1   The purpose of the restraining order was to preserve the status quo.  (Id.)  As the Bankruptcy Court

2   explained in response to JFL's concerns the money would disappear if it went to EA:

3              THE COURT: Can we fashion something where if moneys come in
              from these lawsuits, he (Avenatti) needs to put them in his trust
4              account and notify the Court and Mr. Frank that this money has
              come in, *he's not to touch it*?  I mean this is an officer of the Court.
5              So if he touches it, he's in – you know, I'll do something about it.

6

7   (Id. at 43:15-20 (emphasis added).)

8        Unfortunately, it appears JFL's concerns were well founded as EA has repeatedly violated

9   the Restraining Order.

10       *First,* EA has never filed the notice of receipt of funds on time, and only does so after JFL

11  notifies EA and/or the Court of EA's non-compliance.  (Frank Decl., ¶ 19.)  To date, EA has not

12  filed a notice for any money received after December 12, 2018, despite its assurances it would submit

13  the notice by the 15th of every month.[1]  (Id.)

14       *Second*, it appears EA has been improperly transferring fees from Cases subject to the

15  Restraining Order to Avenatti and his related entities in violation of the Restraining Order.

16       For example, during the initial debtor exam, Avenatti testified EA receives $35,000 per

17  month in fees from a client named Medline Industries, Inc. ("Medline"), in connection with one of

18  the Cases covered by the Restraining Order ("Medline v. Kimberly Clark").  (Frank Decl., Ex. 11 at

19  41:11-42:8; Ex. 12, ¶ 14.)  Prior to the entry of the Restraining Order, EA would deposit the Medline

20  fees into its operating account.  (Id.., ¶ 25, Ex. 15.)  After the issuance of the Restraining Order in

21  July, EA began depositing the Medline fees into a client trust account.  (Id., Exs. 16, 22-24.)

22

23

24  [1] In response to an earlier Motion for Contempt filed by JFL, EA argued the Restraining Order was "silent" on *when*
    EA had to send the notice of receipt of money and opposed JFL's contention that EA had to provide prompt notice
25  upon receipt of payment.  (Case No. 8:17-bk-11961-CB, Doc. 538.)  Instead, EA argued it "always intended to file its
    status reports on a monthly basis much like the monthly operating reports that it filed in the bankruptcy case" and
    would do so on the 11th of each month.  (Id. at 2.)  At a hearing on August 27, 2018, the Bankruptcy Court permitted
26  EA to file the notice by the 15th of each month.  (Frank Decl., ¶ 19, Ex. 14 at 44:7-12.)  But when September 15th,
    arrived, EA failed to provide the notice.  (Id.)  After sending notice to EA's counsel of the non-compliance, EA
27  subsequently served the notice on September 18.  (Id.)  On October 15, EA once again failed to provide the notice.
    (Id.)  After JFL notified EA of the deficiency, EA sent a notice on October 18.  (Id.)  Nothing was sent in November
28  2018.  (Id.) After raising this delinquency with the Magistrate Judge, EA filed a notice on December 18, 2018 for the
    time period October 13 through December 12, 2018.  (Id.)  No other notices have been provided since.  (Id.)

-13-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

APPENDIX B - Pg. 14

1   However, at the end of each month, the $35,000 fee was gone -- as JFL discovered by subpoenaing

2   EA's client trust account records through October 2018. (<u>Id.</u>, Exs. 21-24.)

| Client Trust Account (4613) | Ending Balance |
|---|---|
| July 2018 | $333.19 |
| Aug. 2018 | $181.06 |
| Sept. 2018 | $4,184.50 |
| Oct. 2018 | $15,047.53 |

9        *Where did the money go*?  During that same period, EA transferred money from its <u>client</u>

10  <u>trust account</u> (4613) to Avenatti's personal corporation (AA) and coffee company (Global Baristas),

11  among other non-EA clients.  For example:

12       • On July 20, 2018, EA deposited the $35,000 Medline fees into the client trust account.

13            ▪ On July 25, 2018, EA transferred $39,650 to Avenatti's coffee company

14               (Global Baristas)

15       • On September 10, 2018, EA deposited $35,000 from Medline into the client trust

16          account.

17            ▪ On September 11, EA transferred $2,500 to AA.

18            ▪ On September 12, EA transferred $3,400 to AA.

19            ▪ On September 14, EA transferred $2,400 to AA.

20       • On October 29, 2018, EA deposited $35,000 from Medline into the client trust account.

21            ▪ On October 29, EA transferred $600 to AA.

22            ▪ On October 31, EA transferred $4,000 to AA.

23   (Frank Decl., Exs. 21, 22, 24.)

24       As discussed in greater detail below, it appears fees from other Cases covered by the

25  Restraining Order where likewise deposited into EA's client trust accounts only to be transferred to

26  Avenatti and his related companies and creditors.  Beyond being a violation of the Restraining Order,

27

28

-14-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1    Avenatti's commingling of personal funds in EA's client trust accounts and use of the accounts to

2    conceal EA's payments to Avenatti and his entities is unlawful. [2]

3    **D. EA and Avenatti Have Been Hiding EA's Assets in Undisclosed Bank Accounts Both**
        ***During* and *After* EA's Bankruptcy.**

4    JFL's post-judgment discovery has also uncovered serious violations of bankruptcy laws,

5    demonstrating the need for a receiver.

6    1. **Avenatti Set Up Undisclosed Bank Accounts After Filing for Bankruptcy.**

7    Pursuant to the Operating and Reporting Requirements of the U.S. Trustee ("ORR"), a

8    Chapter 11 Debtor must "immediately close pre-petition bank accounts and open new 'debtor in

9    possession' bank accounts" ("DIP accounts"). (ORR, Operating Guidelines I(A)(1); 11 U.S.C. 345,

10   704(8); 28 U.S.C 586.). "All receipts must flow through the debtor in possession account(s)." (Id.)

11   In fact, the first page of every Monthly Operating Report filed by EA reminded EA that:

12   

13   • All receipts must be deposited into the general account.

14   (Case No. 8:17-bk-11961-CB, Doc. 99, 100, 126, 162, 209, 227, 260, 294, 310, 316, 372.)

15   EA consented to be placed into Chapter 11 bankruptcy on March 10, 2017. (Case No.

16   6:17-bk-01329-KSJ, Doc 12.) On May 23, 2017, EA closed its pre-petition accounts at California

17   Bank & Trust ("CBT")[3] and opened three DIP accounts at the bank.[4] (Frank Decl., ¶ 28, Ex. 25.)

18   However, on May 11, 2017, 12 days before EA opened the DIP accounts, Avenatti opened

19   two new accounts at City National Bank ("CNB") under the name "Michael Avenatti, Esq.": one of

20   which was as an operating account (3504) and the other designated as a "client trust account"

21   (3512).[5] (Frank Decl., ¶ 30, Exs. 27, 28.) The signators on the accounts were Avenatti and EA's

22   office manager, Judy Regnier. (Id.) The address list on the account was for EA. (Id.) A few months

23   
24   [2] Hamilton v. State Bar 23 Cal.3d 868, 874-76 (1979) (it is improper for attorney to make personal use of trust account);
     CRPC 1.15(c) (prohibiting commingling of law firm funds in a client trust account); Coppock v. State Bar 44 Cal.3d
     665, 671-72, 678-81 (1988) (cannot set up trust account for purpose of concealing assets from creditors).

25   [3] EA did not close its existing client trust account at CBT (8671). (Frank Decl., ¶ 29, Ex. 26.) Further, during the
     bankruptcy, EA opened two new undisclosed client trust accounts at CBT: CBT (3714) opened on or about September
26   19, 2017 and CBT (4613) opened on or about January 26, 2018. (Id.)

27   [4] EA opened a general DIP operating account (0313), a DIP payroll account (0321) and a DIP IRS account (0339).
     (Frank Decl., ¶ 28, Ex. 25.)

28   [5] JFL is only identifying the last four digits of the bank accounts pursuant to the Court's instructions. (Doc. 34.)

-15-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

later, while EA was still in bankruptcy, Avenatti opened two more client trust accounts at CNB: one on or about September 15, 2017 (4705) and the other on or about December 28, 2017 (5566).  (Id., ¶ 31, Ex. 29, 30.)

Avenatti never disclosed these CNB accounts during the bankruptcy. (Frank Decl., 32.)  In fact, under questioning by the U.S. Trustee's Office during the 341(a) Meeting of Creditors, Avenatti denied, under oath, that he currently had any client trust accounts in his name.  (Id., Ex. 5 at 187:16 – 188:14.)  Further, during the initial judgment debtor exam in this matter on July 25, 2018, Avenatti testified that EA's only accounts during the last four years were at CBT.  (Id.., Ex. 11 at 32:14-33:14.)  However, as the evidence establishes below, Avenatti was depositing millions of dollars of EA fees into these undisclosed CNB accounts both during and after the bankruptcy.

> 2.  **During the Bankruptcy, Avenatti Secretly Deposited EA Fees from the NFL Super Bowl Litigation into the Undisclosed CNB Accounts and then Transferred the Money to his Personal Corporation AA.**

The first diversion of EA money into the undisclosed CNB accounts occurred right when they were opened in May 2017.

EA was counsel of record in a series of consolidated lawsuits related to Super Bowl XLV in Dallas, Texas entitled Greco v. NFL et al. ("Greco v. NFL").  (Frank Decl., ¶ 34, Ex. 32, ¶ 2.). EA listed its right to contingency fees from the Greco v. NFL cases as one of its assets on its amended bankruptcy schedule.  (Id., Ex. 31, ¶ 8.)  The Greco v. NFL cases were settled in 2017 during the EA bankruptcy.  (Id., ¶ 34, Ex. 32, ¶ 4.)

In May 2017, EA's co-counsel received a wire of $1.55 million into its client trust account as part of the settlement of the Greco v. NFL cases.  (Frank Decl., Ex. 32, ¶ 7; Ex. 34.)  The co-counsel and EA agreed this amount would be distributed as follows: $188,281.73 to co-counsel and the balance of $1,361,718.27 to EA.  (Id.)  On May 15, 2017, Avenatti directed his co-counsel, via an email, to split up the amount owed to EA into two payments. (Id., Ex. 32, ¶ 8; Ex. 35.) Specifically, Avenatti instructed co-counsel to wire $408,723.70 to EA's account at CBT and the remaining $952,994.57 to the client trust account at CNB.  (Id., Exs. 32, 35, 36.)

EA disclosed the receipt of the $408,723.70 in its Monthly Operating Report for May 2017. (Case No. 8:17-bk-11961-CB, Doc. 126, pp. 1, 23.)  However, EA did not disclose the receipt of the

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1  other $952,994.57.  (Id.)  In other words, EA and Avenatti made it appear to the Bankruptcy Court,

2  the U.S. Trustee's office and EA's creditors that EA only received $408,723.70 from co-counsel in

3  May 2017, when in fact it received over $1.36 million.  (Id.)

4     Avenatti then transferred virtually all of the $952,994.57 from the CNB client trust account

5  (3512) to the operating account at CNB (3504) in seven separate transactions over the next two

6  months.  (Frank Decl., Exs. 37, 38.)  From there, Avenatti would immediately transfer the money to

7  Avenatti's personal corporation, AA, which held a separate bank account at CBT.  (Id., Exs. 38, 39.)

8  Once the money was in the AA account, Avenatti would use the money for his personal expenses -

9  - such as his monthly rent at the Ten Thousand luxury apartment building in Century City

10 ($14,235.98), monthly car payments on his Ferrari ($4,000), Traditional Jewelers ($11,000), Koi

11 fish ($1,348), etc. -- as well as larger transfers to his other business interests, such $150,000 to his

12 coffee company (Global Baristas) and $232,875 to HTP Motorsport GmBh for his auto racing hobby.

13 (Id., Ex. 39.)

14     The chart below shows the flow of money from the undisclosed accounts to AA.

| Date | CNB 3512 | CNB 3504 (Amount Received from CNB 3512) | AA CBT 0661 (Amount Received from CNB 3504) |
|---|---|---|---|
| May 1, 2017 | $0 | $0 | $446.52 |
| May 17, 2017 | $952,994.57 | $325,000 | $320,000[6] |
| May 18, 2017 | | $175,000 | $175,000 |
| May 23, 2017 | | $140,000 | $145,000 |
| June 6, 2017 | | $150,000 | $160,000 |
| June 16, 2017 | | $100,000 | $100,000 |
| June 23, 2017 | | $50,000 | $50,000 |

[6] The $5,000 difference between the amount the CNB 3504 account received on May 17, 2017 ($325,000) and then sent to AA ($320,000) was reconciled on May 23, 2017, when the CNB 3504 sent an additional $5,000 to AA (i.e., the CNB 3504 account received $140,000 and immediately wired out $145,000 to AA.)  (Frank Decl., Exs. 36-38.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

| July 19, 2017 | | $7,000 | | $7,000 |
|---|---|---|---|---|
| TOTAL | $952,994.57 | $947,531.96 | | $957,000[7] |

In sum, the evidence proves that while in bankruptcy, Avenatti secretly diverted over $950,000 of money from an EA lawsuit (Greco v. NFL) to Avenatti's undisclosed bank accounts at CNB, while misleadingly reporting in the bankruptcy that EA received only $408,723.70. Avenatti then transferred the $950,000 to his personal corporation (AA) through the undisclosed CNB accounts without the knowledge of the Bankruptcy Court or EA's creditors.

3. **During the Bankruptcy, Avenatti Secretly Deposited EA Fees from the Barela Litigation into the Undisclosed CNB Accounts and then Transferred the Money to Pay-Off Avenatti's Personal Debts.**

The Greco v. NFL money was not the only asset EA and Avenatti hid from the Bankruptcy Court and its creditors.

EA was counsel of record for Greg Barela in a lawsuit entitled Barela v. Brock USA, LLC, Case No. 8:15-cv-779 ("Barela") filed in U.S District Court for the Central District of California in May 2015. (Frank Decl., ¶ 44, Ex. 41.) The lawsuit was compelled to arbitration before the Judicial Arbiter Group, Inc. in Colorado. (Id.)

During the bankruptcy, on or about December 28, 2017, Avenatti opened another undisclosed "client trust account" at CNB (5566). (Frank Decl., ¶ 45, Ex. 30.) On January 5, 2018, this account received a wire of $1.6 million from Brock USA LLC. (Id., Ex. 42.) The wire states the payment was for the "Brock USA 2018 Settlement Payment":

---

[7] From May 2017 through July 2017, the only other deposits into the CNB 3504 account were (a) $6,035.77 from Avenatti's coffee company, Global Baristas on May 11, 2017; (b) $23,160 from an escrow company (Mulholland Escrow) on May 24, 2017 and (c) $8,150 from a source unknown on June 13, 2017. (Frank Decl., Ex. 38.) Consequently, with the exception of the additional $10,000 received by AA on June 6, 2017, all of the money received by AA directly traces back to the Greco v. NFL case.

-18-

MOTION FOR APPOINTMENT OF RECEIVER AND RESTRAINING ORDER



```
NK: CNB     SND DATE: 180105          VAL: 180105       TRN: 180105-00006073
MT:$1,600,000.00                      CUR: USD          FOR AMT: 1,600,000.00
SRC: FED    ADV: LTR     TYP: FTR     LOC:              CHECK NUM:

DBT:        0399                      CDT:        566
ACC:        287          ON FILE: N   ACC:        5566          ON FILE: Y
DEPT: 098               CTRY:         DEPT: 270                CTRY:
SILICON VALLEY BANK                   MICHAEL J AVENATTI
SANTA CLARA, CA                       ATTORNEY CLIENT TRUST ACCOUNT
                                      520 NEWPORT CENTER DR SUITE 1400
SEND:                                 NEWPORT BEACH CA 92660
SNDR REF NUM: 2018005112210

ORIG: /3300963331                     BNF:                      BK: N
BROCK USA LLC
3090 STERLING CIRCLE STE 102          ORIG TO BNF INFO:
BOULDER, CO 80301                     BROCK USA 2018 SETTLEMENT PAYMENT
REF NUM:
```

(Id., Ex. 43.)

The day earlier, on January 4, 2018, Avenatti deposited into the same newly opened client trust account at CNB (5566) a check from the Judicial Arbiter Group *to EA* for $11,718.75 – which according to memo line on the check was for "Barela v. Brock."  (Frank Decl., Ex. 44.)

Avenatti then used the money from this settlement to pay his personal debts and expenses from the CNB client trust account (5566), including payments to various persons and entities that appear to be related to Avenatti's coffee company (Global Baristas) such as Dillanos Coffee Roasters and Alki Bakery.  (Frank Decl., ¶ 48, Exs. 46, 47.)

EA and Avenatti never disclosed the Barela case on EA's Schedule of Assets in the bankruptcy.  (Frank Decl., Ex. 31.)  Further, EA and Avenatti did not disclose that Avenatti received money from this settlement to pay his personal expenses.  On the contrary, as part of EA's Monthly Operating Report for January 2018, Avenatti signed a statement under penalty of perjury stating that he, as EA's principal, did not receive any compensation that month.[8]  (Case No. 8:17-bk-11961-CB,

---

[8] The signature is dated February 15, 2018, but it is for the January 2018 time period.

1  Doc. 372, p. 16).



2. Has the debtor-in-possession during this reporting period provided compensation or remuneration to any officers, directors, principals, or other insiders without appropriate authorization?  If "Yes", explain below:

No    Yes

X

I, Michael J. Avenatti, Managing Partner, declare under penalty of perjury that I have fully read and understood the foregoing debtor-in-possession operating report and that the information contained herein is true and complete to the best of my knowledge.

2-15-18

Date

Page 16 of 16

Principal for debtor-in-possession

15  (Case No. 8:17-bk-11961-CB, Doc. 372).  Perhaps even more disturbing, Barela recently filed a

16  lawsuit against EA and Avenatti claiming that Avenatti never disclosed he received the settlement

17  payment in January 2018 and, in fact, denied receiving the payment.  (Frank Decl., Ex. 48.)

18          **4.  During the Bankruptcy, EA received *Millions of Dollars* From Another Case
19              EA Failed to Disclose on its Schedule of Assets.**

20          During the bankruptcy, EA opened a new client trust account at CBT (3714) on September

21  19, 2017.  (Frank Decl., ¶ 50, Ex. 26.)  EA did not disclose this account during the bankruptcy.  (Id.)

22  The next day after opening this new account (3714), on or about September 20, 2017, a $5.5 million

23  check was deposited.  (Frank Decl., ¶ 51, Ex. 49.)  The check states "PAY TO THE ORDER OF

24  Eagan Avenatti LLP, as attorney for Jennifer Nadjat-Haiem."  (Id.)



CHUBB

Personal Risk Services
Bankers Standard Insurance Company
One Progress Point Parkway
O'Fallon, MO 63368

BANK of AMERICA

NOT VALID AFTER SIX MONTHS

CHECK NUMBER

51-44- 119 CT    September 18, 2017    0931336788

PAY
Five million five hundred thousand and XX/100 dollars

**$5,500,000.00**

PAY TO THE ORDER OF
eagan avenatti llp ,as attorney for Jennifer Nadjat-Haiem

-20-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1    A search of court records reveals that EA represented Nadjat-Haiem in a personal injury

2  action entitled <u>Jennifer Nadjat-Haiem v. Matthew Joseph Alhadeff</u>.  (Frank Decl., Ex. 50.)  EA <u>did</u>

3  <u>not</u> list this matter on its Schedule of Assets in the bankruptcy.  (<u>Id.</u>, Ex. 31.)  EA further did not

4  disclose to the Bankruptcy Court the receipt of this payment in its Monthly Operating Report.  (Case

5  No. 8:17-bk-11961-CB, Doc. 260.)  Instead, similar to the <u>Greco v. NFL</u> case, Avenatti transferred

6  a portion of the money ($409.241.28) to EA's DIP account -- which amount was disclosed in the

7  Monthly Operating Report -- while keeping the larger portion hidden in the client trust account so

8  he could transfer it to himself and pay-off personal debts without the knowledge of the Bankruptcy

9  Court or EA's creditors.  (<u>Id.</u>, p. 18.)

10    Specifically, in September 2017, EA paid $2,850,000 to the client and transferred

11  $409,241.28 to EA's DIP account, leaving behind a balance in the client trust account of

12  $2,240,935.13.  (Frank Decl., Ex. 51.)

| ATTORNEY CLIENT TRUST ███ 3714 | | | | 220 2 |
| --- | --- | --- | --- | --- |
| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
| 0.00 | 5,500,176.41 | 2,850,000.00 | 409,241.28 | 2,240,935.13 |

16    Over the next two months, October and November 2017, Avenatti transferred approximately

17  $1.7 million from this newly opened client trust account (3714) to himself, his coffee company

18  (Global Baristas) and other coffee-related expenses (Frank Decl., Exs. 52, 53):

| ATTORNEY CLIENT TRUST ███ 3714 | | | | 220 2 |
| --- | --- | --- | --- | --- |
| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
| 2,240,935.13 | 200,250.90 | 1,626,205.34 | 0.00 | 814,980.69 |

| Date | Amount | Description |
| --- | --- | --- |
| 09/29 | 176.41 | INTEREST TRANSFER  0100072101 |
| 10/04 | 95,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000008621  2308401225 |
| 10/05 | 27,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000008966  2308200877 |
| 10/10 | 50,000.00 | WIRE/OUT-2017101000003335;BNF The Escrow Connection;REF 4153  1305001058 |
| 10/10 | 580,000.00 | WIRE/OUT-2017101000006251;BNF Michael J. Avenatti  1305001850 |
| 10/13 | 80,000.00 | WIRE/OUT-2017101300003109;BNF Coblentz Patch Duffy & Bass;RE  1304602153 |
| 10/25 | 228,766.38 | WIRE/OUT-2017102500002218;BNF Jennifer Nadjat-Haiem  1304000612 |
| 10/31 | 301,602.30 | WIRE/OUT-2017103100008158;BNF OSBORN MACHLER TRUST ACCOUNT  1304201959 |
| 10/31 | 121,468.74 | WIRE/OUT-2017103100007949;BNF GLOBAL BARISTAS US LLC;OBI 461  1304201899 |
| 10/31 | 142,191.51 | WIRE/OUT-2017103100007948;BNF GLOBAL BARISTAS US LLC;OBI 461  1304201897 |

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

| Date | Amount | Description |
|---|---|---|
| 10/31 | 250.90 | INTEREST TRANSFER 0100072101 |
| 11/10 | 25,000.00 | WIRE/OUT-2017111000002977;BNF Biloxi Freezing & Processing 1304600804 |
| 11/13 | 18,171.27 | WIRE/OUT-2017111300006071;BNF Alki Bakery Inc 1304401264 |
| 11/13 | 31,737.15 | WIRE/OUT-2017111300006072;BNF Dillanos Coffee Roasters 1304401266 |
| 11/14 | 2,500.00 | WIRE/OUT-2017111400005316;BNF Humberto R. Gray, APLC;REF Inv 1304301410 |
| 11/14 | 40,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000000815 2308100651 |
| 11/17 | 23,470.62 | DEBIT MEMO 5353035696 |
| 11/20 | 30,000.00 | WIRE/OUT-2017112000005602;BNF James R. Gailey & Associates P 1305801531 |
| 11/21 | 40,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000007277 2307901917 |
| 11/24 | 11,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000008467 2307400029 |
| 11/29 | 43,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000004591 2307700951 |
| 11/30 | 56,000.00 | ONLINE XFER TO DDA GLOBAL BARIS ID: 000006742 2307900907 |

As is a common theme, EA and Avenatti did not disclose these insider payments to the Bankruptcy Court and falsely stated, under penalty of perjury, in the October and November 2017 Monthly Operating Reports that EA did not provide "any compensation or renumeration to any officers, directors, principals or other insiders" during the months of October and November 2017. (Case No. 8:17-bk-11961-CB, Doc. 294, 310.)

**5. During the Bankruptcy, Avenatti Received *$29 Million* in Settlement Payments into his Undisclosed Client Trust Account at CNB and Delayed Receiving *Over $8 Million* in Fees Until <u>After</u> the Bankruptcy Dismissal.**

The next incident is perhaps the most devious example of bankruptcy fraud in this Memorandum. During the bankruptcy, in September 2017, Avenatti opened another undisclosed client trust account at CNB (4705). (Frank Decl., Ex. 29.) That same month, approximately $29 million was deposited into the account from a third-party, as well as $899,795.85 from Avenatti.[9]

```
MICHAEL J AVENATTI ESQ          Account Activity
ATTORNEY CLIENT TRUST ACCOUNT   Beginning bal   (9/15/2017)
(MLP SETTLEMENT TRUST)          Deposits        (0)      + 0.00
520 NEWPORT CENTER DR SUITE 1400 Electronic cr   (4)    + 29,774,214.17
NEWPORT BEACH CA  92660
```

(Frank Decl., Ex. 55). Over the next month, approximately $25 million of his amount was distributed to the apparent clients and $899,795.85 to a third-party. (Id., Ex. 56). Avenatti also transferred $2,787,650.87 to his undisclosed operating account at CNB (4705). (Id., Ex. 57.)

---

[9] The $899,795.85 was immediately transferred to a third party. (Frank Decl., Ex. 55, 56.). JFL is still attempting to determine the purpose of this payment.

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1   Of course, none of this was disclosed to the Bankruptcy Court.  (Case No. 8:17-bk-11961-

2   CB, Doc. 260, 294.). But things get even more nefarious, because on <u>March 14, 2018</u>, one day prior

3   to the bankruptcy dismissal, the same third party wired another $8.2 million to the undisclosed

4   account at CNB.  (Frank Decl., Ex. 56.)

5

6   | PERSONALIZED BEAUTY DISCOVERY INC | | | 20180314 | 6707 | 8146288 |
    | PERSONALIZED BEAUTY DISCOVERY INC | | | 20180314 | 6001 | 147972 |

7   In other words, Avenatti delayed payment of over <u>$8.2 million</u> from the third party to ensure it would

8   not be discovered in the bankruptcy.  Avenatti then used this money to cover the Initial Payment of

9   $2.8 million to the IRS and bankruptcy counsel, which the Bankruptcy Court required as a pre-

10  condition to the dismissal. (Case No. 8:17-bk-11961-CB, Doc. 412.)

11  Specifically, one day prior to the dismissal, on <u>March 14, 2018</u>, the third party wired $8.2

12  million to Avenatti's undisclosed "client trust" account at CNB.  (Frank Decl., Ex. 56.)  On <u>March

13  15, 2018</u>, Avenatti wired $3 million from the CNB client trust account (4704) to an EA client trust

14  account at CBT (4613).  (<u>Id.</u>, Exs. 17, 56.)  Avenatti opened this EA client trust account (4613) on

15  January 26, 2018 around the time EA filed its motion to dismiss the bankruptcy.  (<u>Id.</u>, Ex. 26.)

16  Avenatti then wired the $2.8 million initial payment to his bankruptcy counsel, Mark Horoupian of

17  SulmeyerKupetz, who verified in a declaration that his firm received the Initial Payment for

18  disbursement.  (Case No. 8:17-bk-11961-CB, Doc. 408.)  As a result, the Bankruptcy Court entered

19  the dismissal order.  (<u>Id.</u>, Doc. 412.)

20  As to the remaining money, during the period March 20, 2018 to May 1, 2018, Avenatti

21  wired over $1 million from the CNB account (4705) to a different EA client trust account at CBT

22  (3714), from which he made personal payments. (Frank Decl., ¶ 57, Ex. 56.)  And then, as the <u>May

23  14, 2018</u> deadline for EA's first Settlement Payment to JFL approached, Avenatti transferred the

24  remaining amount of over <u>$4 million</u> to a clearing account at the Boston Private Bank & Trust, Co.,

25  thereby emptying the CNB account prior to JFL's Judgment.  (<u>Id.</u>)

26

27

28

-23-

| Beneficiary | Tran Date | Tran Num | Amount |
|---|---|---|---|
| Eagan Avenatti, LLP | 20180315 | 4607 | 3000000 |
| Eagan Avenatti Trust | 20180320 | 1357 | 200000 |
| Eagan Avenatti Trust | 20180322 | 3379 | 94206 |
| Eagan Avenatti LLP | 20180328 | 3857 | 110000 |
| Eagan Avenatti, LLP Trust | 20180404 | 4490 | 189964 |
| Eagan Avenatti, LLP | 20180409 | 4807 | 150000 |
| Eagan Avenatti LLP Trust | 20180411 | 2576 | 49976 |
| Eagan Avenatti, LLP Trust | 20180417 | 1878 | 200000 |
| Long Tran | 20180423 | 6696 | 147972 |
| EAGAN AVENATI TRUST | 20180501 | 4152 | 51992 |
| IM&T Operations Clearing Account | 20180504 | 3320 | 4000000 |
| IM&T Operations Clearing Account | 20180504 | 3319 | 146288 |

In sum, unless this is one of world's greatest coincidences, Avenatti structured a settlement with a third-party whereby it did not pay the full amount owed until one day before the dismissal of EA's bankruptcy, thereby avoiding any disclosure to the Bankruptcy Court, JFL or EA's other creditors. And when the time came to pay JFL, Avenatti transferred over $4 million to another undisclosed account so the money would not be available to satisfy JFL's Judgment.

**6.  Avenatti Has Diverted *Millions of Dollars* of EA Fees After the Bankruptcy Dismissal and Entry of JFL's Judgment.**

EA and Avenatti's efforts to conceal money from JFL continued after the Bankruptcy dismissal on March 15, 2018 and the entry of JFL's Judgment on May 22, 2018.

For example, on June 18, 2018, a third-party wired $17 million to the same undisclosed client trust account at CNB that Avenatti set up for the Greco v. NFL money (CNB 3512). (Frank Decl., ¶ 59, Ex. 36.) That same day, Avenatti wired $1.2 million in fees from this settlement into another undisclosed client trust account that EA opened at CBT (4613) during the bankruptcy on January 26, 2018. (Id., Exs. 21, 39.) The money was then transferred to various Avenatti entities (AA and Passport 420) and related third-parties (the X-Law Group).[10]  (Id., Ex. 39.)

Further, a review of EA and Avenatti's client trust accounts demonstrates EA and Avenatti are improperly comingling personal funds in these accounts, and more significantly diverting the funds to pay Avenatti's companies, personal debts and investments. For example, with respect to EA's client trust accounts at CBT:

---

[10] The X-Law Group is purportedly a separate law firm from EA. However, EA has been paying the salaries and rent for the X-Law Group since EA filed for bankruptcy, as Avenatti admitted during the second 341(a) Meeting of Creditors. (Id., Ex. 6 at 70:2 – 73:18.)

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

- EA has transferred over $1,974,219 to Avenatti's coffee company (Global Baristas), including $352,950 since the dismissal of the bankruptcy.

- EA has transferred $629,660 to Avenatti's personal corporation (AA), including $462,150 since the dismissal of the bankruptcy.

- EA has transferred $112,500 to Avenatti's private plane holding company (Passport 420), including $91,200 since the dismissal of the bankruptcy.

(Frank Decl., ¶ 60.)  This does not include the other non-EA related payments that are noted in the previous sections.  (Id.)

### 7. Avenatti Has Been Attempting to Reduce and Divert EA's Right to Attorney Fees in the Future for the Benefit of Himself and his other Entities.

EA and Avenatti also have been intentionally impairing and diverting EA's rights to future attorney fees to avoid paying the Judgment.

For example, one of EA's largest known assets is its right to attorney fees and costs in a class action entitled <u>Bahamas Surgery Center LLC. V. Kimberly-Clark Corp. *et al.*</u>, Case No. CV 14-8390-DMG (PLAx) (the "<u>Kimberly-Clark</u> class action").    (Frank Decl., ¶ 61.)   During the bankruptcy, EA obtained a trial verdict of approximately $5 million in compensatory damages and prejudgment interest, and approximately $449 million in punitive damages.  (Case No. CV 14-8390-DMG, Doc. 501, 503.) The trial court (the Honorable Dolly Gee) reduced the punitive damage award on remittitur to approximately $20 million and entered a judgment against Defendants for approximately $25 million.  (Id., Doc 529, 578.)  Defendants appealed the judgment, and EA, on behalf of the class, appealed the punitive damage award reduction. (Frank Decl., ¶ 61.)  The Parties agreed to delay EA's application for fees and costs until after the resolution of the appeals.  (Id.)  The briefing on the appeals is scheduled to conclude next month in March 2019.  (Id.)

Assuming the judgment is affirmed, EA will likely be awarded fees and costs of at least $10 million.  (Frank Decl., ¶ 62.)  During the bankruptcy, Avenatti testified that EA was entitled to approximately $17 million in accrued fees and a "significant portion of those fees are from the <u>Kimberly Clark</u> class action case."  (Id., Ex. 5 at 105:4-25.)  However, during these post-judgment proceedings, Avenatti claimed that EA is only entitled to "a *small portion* of the fees from the case

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1   due to the fact the firm was never appointed class counsel in the case." (Case No. 8:17-bk-11961-
2   CB, Doc. 464 at 2.)  Instead, Avenatti contends he *personally* was appointed Class Counsel, not the
3   firm, and therefore he is personally entitled to the fees.  (Id.)

4        This is not how fee awards work in class actions – they are awarded to the firm, not the
5   individual lawyer. (Frank Decl., ¶ 63.)   But even accepting this absurd premise *arguendo*, given
6   that Avenatti is the managing partner of EA, the conflict of interest is obvious.  Absent a receiver,
7   Avenatti could deliberately attempt to have the fees awarded to himself or another entity, at the
8   detriment of EA and its creditors.

9        In fact, after the bankruptcy, Avenatti began attempting to do just that.  He started filing
10  lawsuits under the name of his personal corporation (AA), even though AA is not a registered law
11  firm and even though he was using EA's attorneys and resources on the matters.  (Case No. 8:17-
12  bk-11961-CB, Doc. 470 at 7-10.).  This conduct is addressed in detail in JFL's Amended Motion for
13  an Assignment Order and Restraining Order.  (Case No. 8:17-bk-11961-CB, Doc. 470 at 7-10.)  The
14  scheme is without legal or factual merit.  (Id.)  However, the fact Avenatti is even *trying* this tactic,
15  demonstrates the need for a receiver to protect EA's assets and interests.

16       **8.  EA Removes Its Furniture and Artwork After Being Evicted.**

17       EA was evicted from its office at 520 Newport Center Drive, Newport Beach California on
18  November 28, 2018.  (Frank Decl., ¶ 65, Ex. 58.)   JFL, who has a judgment lien on EA's property,
19  received a notice from the landlord of the right to reclaim abandoned property at the premises by
20  January 10, 2018.  (Id.)  In December, JFL inspected the property with the landlord and made
21  preparations to sell the property.  (Id., ¶ 66.)  Upon inspection, JFL observed that virtually all of the
22  artwork had been removed from the premises.  (Id.)  EA indicated this artwork was worth
23  approximately $50,000 in its bankruptcy schedules.  (Case No. 8:17-bk-11961-CB, Doc. 149, ¶ 39.)
24  When January 10, 2019 deadline arrived, counsel for the landlord notified JFL that Avenatti had
25  taken possession of all of the property over the weekend and removed it from the office.  (Frank
26  Decl., ¶ 67.)  JFL is unaware of what has happened to this property.  (Id.)

27

28

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

III.     **THIS COURT SHOULD APPOINT A RECEIVER**

    A.   **Legal Standard.**

      Rule 69(a) of the Federal Rules of Civil Procedure ("FRCP") govern the execution of final judgments and provides that "proceedings supplementary to and in aid of judgment or execution – must accord with the procedures of the state where the court is located, but a federal statute governs to the extent it applies."  FRCP 69(a)(1).   FRCP Rule 66 generally governs the appointment of receivers.  Office Depot, Inc. v. Zuccarini, 596 F.3d 696, 701 (9th Cir. 2010).   However, because California has specific statutes governing the appointment of receivers to aid in the enforcement of money judgments, state law applies.  Id.; but see USACM Liquidating Trust v. Monaco, 2012 WL 12883959, *2-3 n. 7 (distinguishing Zuccarini and holding the Rule 66 applies over California law but finding that "California law does not substantially differ from federal law on the appointment of a receiver").

      Pursuant to California Code of Civil Procedure ("CCP") Section 564, a court may appoint a receiver "after judgment to carry the judgment into effect" and "after judgment, to dispose of the property according to the judgment . . ."  CCP 564(b)(3), (4); Gold v. Gold Realty Co., 114 Cal. App. 4th 791, 804-05 (2003).  CCP Section 708.620 provides the Court with authority to "appoint a receiver to enforce the judgment where the judgment creditor shows that, considering the interests of both the creditor and the judgment debtor, the appointment of a receiver is a reasonable method to obtain the fair and orderly satisfaction of the judgment."  Conaway v. Conaway, (1963) 218 Cal. App. 2d 427, 428.  Likewise, a receiver may be appropriate when  judgment debtors "repeatedly thumb[] their noses" at enforcement efforts.   City & County of San Francisco v. Daley, 16 Cal.App.4th 734, 744, (1993).  The receiver's fees and costs may be added to the judgment.  CCP § 685.070(a)(5).

      The court may also appoint a receiver to manage the business affairs of a law firm.  O'Flaherty v. Belgum, 115 Cal.App.4th 1044, 1061-62 (2004).  Receivers further may be appointed to investigate and recover potential fraudulent transfers.  Cal. Civ. Code § 3440(b); Donell v. Kowell, 533 F.3d 762, 770-71 (9th Cir. 2008).

A restraining order against a judgment debtor may entered to restrain the judgment debtor from assigning or otherwise disposing of the debtor's rights to future payments.  Cal. Code Civ. P. § 708.520.  The threshold for showing of "need" for a restraining order is "relatively low" and demonstrating a debtor is not paying a judgment is sufficient.  See, e.g. Legal Additions LLC v. Kowalksi, 2011 WL 3156724 at *3 (N.D. Cal. July 26, 2011).

**B.  The Appointment of a Receiver is Appropriate and Urgently Needed**.

Federal courts consider a variety of factors in determining whether to appoint a receiver, including, for example: (1) "whether [the party] seeking the appointment has a valid claim"; (2) "whether there is fraudulent conduct or the probability of fraudulent conduct," by the defendant; (3) whether the property is in imminent danger of "being lost, concealed, injured, diminished in value, or squandered"; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) "the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property"; and, (7) "whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership." Canada Life Assur. Co. v. LaPeter, 563 F.3d 837, 844 (9th Cir. 2009); see also USACM Liquidating Trust 2012 WL 12883959, at *2-3 n. 7 (noting these elements are likewise considered under California law).

All of these elements are satisfied in the present case:

1.      JFL has a final $10 judgment and priority lien on EA's assets, so it has a "valid claim." (Frank Decl., ¶¶ 11, 13-14, Ex. 8.)

2.      The lengthy factual recitation above demonstrates there has been "fraudulent conduct or the probability of fraudulent conduct" by EA and Avenatti, including serious examples of bankruptcy fraud and concerted efforts to conceal assets from JFL and divert them to Avenatti, his corporate entities and other third parties.

3.      EA's assets are in imminent danger of "being lost, concealed, injured, diminished in value, or squandered."  Again, the factual recitation above includes numerous examples of EA and Avenatti (a) concealing millions of dollars of fees in undisclosed accounts, (b) diverting money to Avenatti and his corporate entities through improper transfers from client trust accounts; (c)

-28-

1   removing physical property and artwork from EA's office; (d) violating the Bankruptcy Court's

2   restraining order; (e) seeking to diminish EA's right to fees in the <u>Kimberly-Clark</u> class action by

3   threatening to have the fees awarded to Avenatti personally rather than the firm; and (f) filing new

4   cases under a different "law firm" name, while using EA's attorneys and resources on the cases.

5       4.    Legal remedies are inadequate.  JFL already has a sizable money judgment against

6   EA.  The problem is collecting the judgment.

7       5.    The potential harm to JFL without the appointment of a receiver is extreme, i.e., JFL

8   will not be able to collect the Judgment.  This harm outweighs any inconvenience of having a

9   receiver manage and oversee the firm.

10      6.    JFL's "probable success in the action" and the "possibility of irreparable injury to

11  plaintiff's interest in the property" is clear.  Again, JFL has a final Judgment, and if the property is

12  permitted to dissipate, JFL will suffer irreparable injury because it will never be able to collect on

13  the Judgment.

14      7.    JFL's "interests will be well served by the appointment of a receiver" because, *inter*

15  *alia*: (a) the receiver will have the ability to access EA's financial records and client information and

16  produce that information as required by the Court's existing orders; (b) the receiver will be able to

17  manage the client trust accounts and ensure there are no longer any improper transfers or

18  commingling of money; (c) the receiver will be able to preserve assets so they may be paid to satisfy

19  JFL's Judgment in an orderly fashion; (d) the receiver will be able to investigate potential fraudulent

20  transfers to third parties and evaluate whether to bring claims against those parties for the benefit of

21  EA and its creditors, including JFL; and (e) the receiver will be able to ensure that EA's interests are

22  represented in any future fee applications.

23      In sum, the appointment of a receiver is a reasonable, and indeed <u>necessary</u>, method to obtain

24  the fair and orderly satisfaction of the Judgment.  CCP § 708.620.

25  **C. The Powers of the Receiver.**

26      In <u>O'Flaherty</u>, the trial court vested the receiver taking over the law firm with "all the usual

27  powers, rights and duties of receivers appointed by this Court or otherwise defined by statute" and

28  granted the receiver the power to "operate and conduct the [law firm] in the ordinary course of its

1    business other than practicing law" on behalf of the firm's clients.  115 Cal.App.4th at 1061-62.

2    This Court should grant the proposed Receiver in this case these same broad powers to manage the

3    affairs of EA and its assets, with the limitation that the Receiver cannot provide legal services for

4    EA's clients.  These powers should include, but not be limited to the following:

5         1.    The Receiver shall take possession of all past and current client engagement

6    contracts, case files, books and records, electronic files, and other documents necessary to manage

7    the Receivership Assets without limitation, *except* that the Receiver will not be authorized to provide

8    legal services to EA's clients;

9         2.    The Receiver shall be the sole signatory to any contract of EA during the

10   receivership;

11        3.    The Receiver shall have the ability to investigate fraudulent transfers and avoidance

12   actions and to pursue litigation;

13        4.    The Receiver shall have the power to sell assets upon Court approval;

14        5.    The Receiver shall have the power to make payments toward the Judgment upon

15   Court approval;

16        6.    The Receiver shall be authorized to and shall perform the following duties and

17   functions:

18             a.   Make all inquiries EA might have made;

19             b.   Bring and defend actions in his own name, as Receiver;

20             c.   Hire legal counsel, accounting and tax professionals at normal and customary rates

21   to represent the Receiver in his duties, provided however, legal counsel retained to pursue fraudulent

22   and avoidable actions shall be on a contingency basis;

23             d.   Have control of, and to be added as the sole authorized signatory for all accounts of

24   EA, including all accounts at any bank, title company, escrow agent, financial institution or

25   brokerage firm which has possession, custody or control of any assets or funds of the EA, or which

26   maintains where EA employees or agents in such capacity have signatory authority;

27             e.   Open and close bank accounts;

28

-30-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

f.    Endorse and deposit checks, money, negotiable instruments or commercial paper through which EA is compensated in any manner whatsoever into a receivership account;

g.    Pay all necessary costs and expenses to operate EA in order to maximize its assets;

h.    Manage the business affairs of EA, including monitoring and approving necessary expenses needed to operate the business and accepting new business contracts;

i.    Have access to and become the "administrative user" for all of EA's software programs and website;

j.    Maintain detailed accounting records of all deposits to and all expenditures from the Receiver's bank account, and until the termination of the receivership;

k.    Disburse funds to pay for the Receivership fees and costs to which the Receiver is entitled;

l.    Disburse funds to JFL and/or EA, or any other creditor as ordered by this Court;

m.    Conduct investigation and discovery, as may be necessary to locate and account for all of the assets of or managed by EA, including receiving, collecting and reviewing all mail addressed to EA, and change the mailing address to an address specified by the Receiver;

n.    Take such action as is necessary and appropriate to preserve and take control of and to prevent the waste, dissipation, loss of value, concealment, or disposition of any assets of or managed by EA;

o.    The power to enter into settlements on behalf of EA with the approval of the Court; and

p.    The power to hire counsel to represent EA's interests in any application for fees and costs in cases in which EA attorneys provided legal services.

As part of the Order, the Court should direct EA and Avenatti to:

1.    Immediately respond to all inquiries of the Receiver pertaining to EA;

2.    Provide keys and passwords to the Receiver and grant the Receiver unfettered access to EA and all premises and computer systems relating thereto;

-31-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

3.    Add the Receiver as an additional insured on the policies for the period that the Receiver shall be in possession of the estate; the Receiver shall not be liable for EA's failure to carry or obtain adequate insurance; and

4.    Turn over all undeposited checks to the Receiver.

5.    Meet and disclose all current cases being managed by EA with the Receiver and JFL within seven business days of the entry of the order appointing the Receiver.

These powers and duties are set forth in greater detail in the [Proposed] Order and are modeled on the California forms for an Order to Show Cause re: Appointment of a Receiver found at www.court.ca.gov/documents/rc310.pdf.

**IV.    NOMINATION OF BRIAN WEISS AS RECEIVER**

JFL has nominated Brian Weiss as the receiver, and he has agreed to serve as Receiver if appointed by the Court.  As set forth in his declaration, Weiss is a highly experienced fiduciary and has served in numerous court-appointed and approved fiduciary capacities including Receiver, Plan Trustee, Litigation Trustee, Liquidating Trustee, Chief Restructuring Officer, Responsible Officer, and Manager and is completely qualified to serve as a receiver to enforce the Judgment in this case and operate EA until cessation of the receivership.    Weiss has experience with post-judgment enforcement as well as administration of business operations.  In addition to his skill and expertise, Weiss is qualified because he has no personal bias in the case.  (See Declaration of Brian Weiss, Exs. A and B.)

JFL further requests that should Weiss be appointed, his fees, the fees of any attorneys or other professionals retained by him, and all other attendant costs of the receivership estate be paid from the income and assets of EA as costs added to the Judgment.  Pursuant to CCP § 685.070(a)(5), all costs associated with the appointment of a receiver (under CCP § 708.620) to assist in the enforcement of a money judgment may be claimed as a cost and added to the Judgment.

**V.    CONCLUSION.**

For all the foregoing reasons, JFL respectfully request the Court grant this Motion and appoint Weiss as the Receiver over the Judgment Debtor with powers to administer and liquidate the assets of EA in accordance with the concurrently filed and served [Proposed] Order.

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

**APPENDIX B - Pg. 33**

1    Dated: February 12, 2019                              FRANK SIMS & STOLPER LLP

2

3                                                   By:_____/s/ Scott H. Sims_____

4                                                        Scott Sims, Esq.
                                                         Attorneys for Judgment Creditor
5
                                                         Jason Frank Law, PLC
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-33-

MOTION FOR APPOINTMENT OF
RECEIVER AND RESTRAINING ORDER

1

2

3

4

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR 1 0 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

5

6

7

8                 UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                     SOUTHERN DIVISION

11                  September 2018 Grand Jury

12   UNITED STATES OF AMERICA,          SA CR No. 19 **SACR19-00061**

                                                                    JVS
13          Plaintiff,                  I N D I C T M E N T

14          v.                          [18 U.S.C. § 1343: Wire Fraud;
                                        26 U.S.C. § 7202: Willful Failure
15   MICHAEL JOHN AVENATTI,             to Collect and Pay Over Withheld
                                        Taxes; 26 U.S.C. § 7212(a):
16          Defendant.                  Endeavoring to Obstruct the
                                        Administration of the Internal
17                                      Revenue Code; 26 U.S.C. § 7203:
                                        Willful Failure to File Tax
18                                      Return; 18 U.S.C. § 1344(1): Bank
                                        Fraud; 18 U.S.C. § 1028A(a)(1):
19                                      Aggravated Identity Theft; 18
                                        U.S.C. § 152(3): False Declaration
20                                      in Bankruptcy; 18 U.S.C. § 152(2):
                                        False Testimony Under Oath in
21                                      Bankruptcy; 18 U.S.C. § 2(b):
                                        Causing an Act to Be Done;
22                                      18 U.S.C. §§ 981(a)(1)(C), 982,
                                        1028 and 28 U.S.C. § 2461(c):
23                                      Criminal Forfeiture]

24        The Grand Jury charges:

25

26

27

28

COUNTS ONE THROUGH TEN

[18 U.S.C. § 1343]

**A.    INTRODUCTORY ALLEGATIONS**

1.    At all relevant times:

a.    Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was a resident of Orange and Los Angeles Counties, within the Central District of California.

b.    Defendant AVENATTI was an attorney licensed to practice law in the State of California.  Defendant AVENATTI provided legal services to clients in exchange for attorneys' fees.

c.    Defendant AVENATTI practiced law through Eagan Avenatti LLP ("EA LLP") and Avenatti & Associates, APC ("A&A").  EA LLP and A&A's principal offices were located in Newport Beach and Los Angeles, California.

d.    A&A was a professional corporation organized in California.  Defendant AVENATTI was A&A's Chief Executive Officer ("CEO"), Secretary, Chief Financial Officer, and sole director.  Defendant AVENATTI owned 100 percent of A&A.

e.    EA LLP was a limited liability partnership organized in California.  Defendant AVENATTI was EA LLP's managing member and managing partner.  Through A&A, defendant AVENATTI owned at least 75 percent of EA LLP.

f.    Defendant AVENATTI was also the effective owner and controlled a number of other entities, including:

i.    Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California;

ii.    Global Baristas, LLC ("GB LLC"), which wholly owned GBUS;

2

1             iii. GB Autosport, LLC ("GB Auto"), which managed

2    defendant AVENATTI's car racing team; and

3             iv.  Passport 420, LLC ("Passport 420"), which held

4    title to a private airplane defendant AVENATTI used.

5             g.    Defendant AVENATTI was a signatory on and exercised

6    control over the following bank accounts, which were all maintained

7    in Orange and Los Angeles Counties, within the Central District of

8    California:

9             i.    California Bank & Trust ("CB&T") attorney trust

10   account ending in x8541 in the name of "The State Bar of California,

11   Eagan Avenatti LLP, Attorney Client Trust Fund" ("EA Trust Account

12   8541").

13            ii.  CB&T attorney trust account ending in x3714 in

14   the name of "The State Bar of California, Eagan Avenatti LLP,

15   Attorney Client Trust Account" ("EA Trust Account 3714").

16            iii. CB&T attorney trust account ending in x4613 in

17   the name of "State Bar of California, Eagan Avenatti LLP, Attorney

18   Client Trust Account" ("EA Trust Account 4613").

19            iv.  CB&T attorney trust account ending in x8671 in

20   the name of "The State Bar of California, Eagan Avenatti LLP,

21   Attorney Client Trust Account" ("EA Trust Account 8671").

22            v.   CB&T account ending in x2851 in the name of

23   "Eagan Avenatti LLP" ("EA Account 2851").

24            vi.  CB&T account ending in x8461 in the name of

25   "Eagan Avenatti LLP, Operating Account" ("EA Account 8461").

26            vii. CB&T account ending in x0313 in the name of

27   "Eagan Avenatti LLP, Debtor-in-Possession Case 8:17-BK-11961-CB,

28   General Account" ("EA DIP Account 0313").

3

1    viii.    CB&T account ending in x0661 in the name of

2  "Avenatti & Assoc. A Professional Corp." ("A&A Account 0661").

3    ix.  City National Bank ("CNB") attorney trust account

4  ending in x5566 in the name of "Michael J. Avenatti, Attorney Client

5  Trust Account" ("Avenatti Trust Account 5566").

6    x.    CNB attorney trust account ending in x4705 in the

7  name of "Michael J. Avenatti, Esq., Attorney Client Trust Account"

8  ("Avenatti Trust Account 4705").

9    xi.  CB&T account ending in x2240 in the name of

10  "Global Baristas US LLC, Operating Account" ("GBUS Operating Account

11  2240").

12    xii. CB&T account ending in x3730 in the name of

13  "Global Baristas LLC" ("GB LLC Account 3730").

14    h.    Defendant AVENATTI was a signatory on and exercised

15  control over a KeyBank account ending in x6193 in the name of "Global

16  Baristas US LLC" ("GBUS KeyBank Account 6193"), which was maintained

17  in Seattle, Washington.

18    i.    As a member of the State Bar of California, defendant

19  AVENATTI was obligated to comply with the California Rules of

20  Professional Conduct.  Defendant AVENATTI was required, among other

21  things, to promptly notify a client of the receipt of any funds the

22  client was entitled to receive, and to promptly pay or deliver to the

23  client or such payees as designated by the client any such funds that

24  defendant AVENATTI held in trust for the client upon the client's

25  request.

26    j.    Money transmitted through the Fedwire Funds Transfer

27  System (the "Fedwire system") was routed from its origin to its

28  destination through Texas and New Jersey.

4

k.    A "Special Needs Trust" was a specialized trust that allowed for a disabled person to maintain his or her eligibility for public assistance benefits, despite having assets that would otherwise make the person ineligible for those benefits.

2.    "Client 1" was an individual who resided in Los Angeles County, within the Central District of California.  Beginning as early as in or about 2012 and continuing until in or about March 2019, defendant AVENATTI and EA LLP had a formal attorney-client relationship with Client 1.  Specifically, defendant AVENATTI and EA LLP agreed to represent Client 1 in connection with a lawsuit against the County of Los Angeles and others, alleging violations of Client 1's constitutional rights that led to severe emotional distress and severe physical injuries, including paraplegia (the "L.A. County Lawsuit").

3.    "Client 2" was an individual who resided in Los Angeles County, within the Central District of California.  Beginning as early as in or about December 2016 and continuing until in or about March 2019, defendant AVENATTI and EA LLP had a formal attorney-client relationship with Client 2.  Specifically, defendant AVENATTI and EA LLP agreed to represent Client 2 in connection with potential litigation against an individual with whom Client 2 had a personal relationship ("Individual 1").

4.    "Client 3" was an individual who resided in Orange County, within the Central District of California.  Beginning as early as in or about July 2014 and continuing until in or about November 2018, defendant AVENATTI and EA LLP had a formal attorney-client relationship with Client 3.  Specifically, defendant AVENATTI and EA

5

LLP agreed to represent Client 3 in connection with an intellectual property dispute against a Colorado-based company ("Company 1").

5. "Client 4" and "Client 5" were both individuals who resided in Los Angeles County, within the Central District of California. Beginning as early as in or about August 2017 and continuing until in or about August 2018, defendant AVENATTI had a formal attorney-client relationship with both Client 4 and Client 5. Specifically, defendant AVENATTI agreed to represent both Client 4 and Client 5 in connection with their separation and divestment from one of the companies in which Client 4 and Client 5 owned shares ("Company 2").

**B. THE SCHEME TO DEFRAUD**

6. Beginning as early as in or about January 2015 and continuing through at least in or about March 2019, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant AVENATTI, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim-clients to whom defendant AVENATTI had agreed to provide legal services, including, but not limited to, Client 1, Client 2, Client 3, Client 4, and Client 5, as to material matters, and to obtain money and property from such victim-clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts that defendant AVENATTI had a duty to disclose.

**C. THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD**

7. The fraudulent scheme operated, in substance, in the following manner:

6

1       a.   Defendant AVENATTI would negotiate a settlement on

2  behalf of a client that would require the payment of funds to the

3  client.

4       b.   Defendant AVENATTI would misrepresent, conceal, and

5  falsely describe to the client the true terms of the settlement

6  and/or the disposition the settlement proceeds.

7       c.   Defendant AVENATTI would cause the settlement proceeds

8  to be deposited in or transferred to attorney trust accounts

9  defendant AVENATTI controlled.

10       d.   Defendant AVENATTI would embezzle and misappropriate

11  settlement proceeds to which he was not entitled.

12       e.   Defendant AVENATTI would lull the client to prevent

13  the client from discovering the embezzlement and misappropriation by,

14  among other things, falsely denying the settlement proceeds had been

15  paid, sending funds to the client under the false pretense that such

16  funds were "advances" on the purportedly yet-to-be received

17  settlement proceeds, and falsely claiming that payment of the

18  settlement proceeds to the client had been delayed for legitimate

19  reasons and would occur at a later time.

20                 **Embezzlement of Client 1's Funds**

21       f.   On or about January 21, 2015, defendant AVENATTI

22  negotiated a settlement of the L.A. County Lawsuit on behalf of

23  Client 1.  Under the terms of the negotiated settlement agreement,

24  the County of Los Angeles agreed to pay $4,000,000 to Client 1 in

25  exchange for Client 1 dismissing the L.A. County Lawsuit.  Client 1

26  was entitled to receive the $4,000,000 settlement payment, less EA

27  LLP's attorneys' fees, costs, and expenses.

28

7

1        g.   In or around January 2015, defendant AVENATTI told

2  Client 1 that the County of Los Angeles had agreed to a settlement.

3  Defendant AVENATTI falsely represented to Client 1 that the

4  settlement agreement had to remain confidential, the County of Los

5  Angeles could not pay the settlement to Client 1 in one lump-sum, and

6  the settlement proceeds could not be paid until the County of Los

7  Angeles approved a Special Needs Trust for Client 1.  In truth and in

8  fact, as defendant AVENATTI then well knew, the settlement agreement

9  did not contain a confidentiality provision, the County of Los

10  Angeles had agreed to make a lump-sum $4,000,000 settlement payment

11  to Client 1, and the settlement payment from the County of Los

12  Angeles was not conditioned on the approval of a Special Needs Trust

13  for Client 1.

14        h.   On or about January 26, 2015, defendant AVENATTI

15  caused the approximately $4,000,000 settlement payment to be

16  deposited into EA Trust Account 8541 to be held in trust for Client

17  1.  Knowing that the full settlement amount had been paid by the

18  County of Los Angeles, defendant AVENATTI concealed and failed to

19  disclose to Client 1 that EA LLP had received the $4,000,000

20  settlement payment.  Further, defendant AVENATTI and EA LLP retained

21  and did not transfer Client 1's portion of the settlement payment to

22  Client 1.

23        i.   Between on or about January 26, 2015, and on or about

24  March 30, 2015, defendant AVENATTI caused approximately $3,125,000 of

25  the $4,000,000 settlement payment to be transferred from EA Trust

26  Account 8541 to EA Account 2851.  Thereafter, defendant AVENATTI

27  caused substantial portions of the settlement proceeds to be

28  transferred from EA Account 2851 to A&A Account 0661, and then

8

further transferred to other bank accounts defendant AVENATTI

controlled, including defendant AVENATTI's personal bank account and

bank accounts associated with GBUS and GB Auto, or used to pay

defendant AVENATTI's personal expenses. By no later than July 6,

2015, defendant AVENATTI had drained all of the settlement proceeds

out of EA Trust Account 8541. Defendant AVENATTI concealed and

failed to disclose to Client 1 that the entire $4,000,000 settlement

payment had been expended and that substantial portions of the

settlement proceeds had been used for defendant AVENATTI's own

purposes.

       j.   In order to lull Client 1 and prevent Client 1 from

discovering that defendant AVENATTI had embezzled Client 1's portion

of the $4,000,000 settlement payment, defendant AVENATTI committed

and caused to be committed the following acts:

         i.   Starting as early as in or about July 2015 and

continuing to in or about March 2019, defendant AVENATTI caused at

least 69 payments, each ranging from approximately $1,000 to

approximately $1,900 and together totaling at least approximately

$124,000, to be made to Client 1. During this same time period,

defendant AVENATTI also caused payments to be made to various

assisted living facilities to pay for rent on Client 1's behalf.

Defendant AVENATTI falsely represented to Client 1 that the payments

made to Client 1 and to the assisted living facilities where Client 1

resided were "advances" on the settlement payment from the County of

Los Angeles, which defendant AVENATTI falsely represented had not yet

been received.

         ii.   In or about 2017, after Client 1 told defendant

AVENATTI that Client 1 wanted to purchase his own residence,

9

defendant AVENATTI agreed to help Client 1 find a real estate broker and purchase a house. Defendant AVENATTI represented and promised to Client 1 that Client 1 would be able to use the settlement proceeds to fund the purchase of a house. After Client 1 was in escrow on the purchase of a house, however, defendant AVENATTI falsely told Client 1 that Client 1 could not purchase the house after all because the County of Los Angeles still had not approved the Special Needs Trust and therefore could not make the settlement payment to Client 1. Client 1 was unable to close escrow and did not purchase the house.

iii. On or about November 26, 2018, defendant AVENATTI told Client 1 that defendant AVENATTI would respond on Client 1's behalf to a request that Client 1 provide the United States Social Security Administration ("SSA") information it requested to evaluate Client 1's continued eligibility for Supplemental Security Income ("SSI") benefits, including information regarding the settlement agreement with the County of Los Angeles, the purported Special Needs Trust, and the monthly payments from defendant AVENATTI. Knowing full well that the requested information could lead to inquiries that could reveal that defendant AVENATTI had embezzled Client 1's portion of the settlement proceeds, defendant AVENATTI failed to provide the requested information to SSA, which resulted in Client 1's SSI benefits being discontinued in or about February 2019.

k. On or about March 22, 2019, defendant AVENATTI was questioned regarding the alleged embezzlement of the Client 1 Settlement Proceeds during a public judgment-debtor examination conducted in federal court in Los Angeles, California. Shortly thereafter, in order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion

10

of the $4,000,000 settlement, defendant AVENATTI falsely told Client
1 that the County of Los Angeles had finally approved the Special
Needs Trust for Client 1 and that Client 1 would begin receiving
settlement payments from the County of Los Angeles through the
Special Needs Trust.

l.    In order to further lull Client 1 and to attempt to
establish a defense against any claims Client 1 could bring against
defendant AVENATTI, on or about March 23, 2019, and on or about March
24, 2019, defendant AVENATTI caused Client 1 to sign a document
defendant AVENATTI claimed was necessary to effectuate the settlement
agreement and finalize the Special Needs Trust that defendant
AVENATTI claimed was required before Client 1 could begin receiving
payments due under the settlement, and a document stating that Client
1 was satisfied with defendant AVENATTI's representation of Client 1.

### Embezzlement of Client 2's Funds

m.    On or about January 7, 2017, defendant AVENATTI
negotiated a settlement on behalf of Client 2 with Individual 1.
Under the terms of the settlement agreement, Individual 1 was
required to make an initial payment to Client 2 of approximately
$2,750,000 by on or about January 28, 2017, and an additional payment
to Client 2 of approximately $250,000 on or about November 1, 2020,
if certain additional specified conditions were met, for a total of
approximately $3,000,000.  Client 2 was entitled to receive the
initial $2,750,000 settlement payment, less EA LLP's attorneys' fees
(i.e., 33 percent of the total $3,000,000 settlement amount), costs,
and expenses.

n.    In order to conceal the true details of the settlement
agreement from Client 2, defendant AVENATTI did not provide a copy of

11

1 the settlement agreement to Client 2.  Rather, in or about January
2 2017, defendant AVENATTI falsely represented to Client 2 that
3 Individual 1 would make an initial lump-sum payment, the entirety of
4 which would be used to pay EA LLP's attorney fees (i.e., 33 percent
5 of the total settlement amount) and costs, and then approximately 96
6 monthly payments over the course of the next eight years by which the
7 remaining settlement funds would be paid to Client 2.  In truth and
8 in fact, as defendant AVENATTI then well knew, the actual settlement
9 agreement required Individual 1 to make the initial $2,750,000
10 settlement payment, which far exceeded the money owed to EA LLP for
11 attorneys' fees, by on or about January 28, 2017, and Individual 1
12 was not required to make any monthly payments to Client 2 thereafter.

13       o.   On or about January 25, 2017, defendant AVENATTI
14 caused the initial $2,750,000 settlement payment from Individual 1 to
15 be transferred to EA Trust Account 8671 to be held in trust for
16 Client 2.  Defendant AVENATTI concealed and failed to disclose to
17 Client 2 that EA LLP had received the initial $2,750,000 settlement
18 payment.  Further, defendant AVENATTI and EA LLP retained and did not
19 transfer Client 2's portion of the $2,750,000 settlement payment to
20 Client 2.

21       p.   On or about January 26, 2017, defendant AVENATTI
22 caused $2,500,000 of the $2,750,000 settlement payment to be
23 transferred to an attorney trust account for another law firm ("Law
24 Firm 1").  That same day, defendant AVENATTI caused Law Firm 1 to
25 transfer the entire $2,500,000 to Honda Aircraft Company, LLC, to
26 purchase a private airplane for defendant AVENATTI's company,
27 Passport 420.  Defendant AVENATTI also caused the remaining $250,000
28 of the $2,750,000 settlement payment to be transferred first to EA

12

Account 2851 and then to A&A Account 0661. Defendant AVENATTI concealed and failed to disclose to Client 2 that defendant AVENATTI had used the settlement proceeds in this manner.

q. In order to lull Client 2 and prevent Client 2 from discovering that defendant AVENATTI had embezzled Client 2's portion of the initial $2,750,000 settlement payment, defendant AVENATTI committed and caused to be committed the following acts:

i. Between on or about March 15, 2017, and on or about June 18, 2018, defendant AVENATTI caused approximately 11 payments totaling approximately $194,000 to be deposited into Client 2's bank account. Defendant AVENATTI falsely represented to Client 2 that these payments constituted the monthly settlement payments that were purportedly due from Individual 1. For example, on or about February 20, 2018, defendant AVENATTI caused a $16,000 cashier's check drawn on EA Account 4613 to be deposited into Client 2's bank account, which falsely identified Individual 1 as the "remitter."

ii. Between in or about June 2018 and in or about March 2019, after defendant AVENATTI stopped making the purported monthly payments to Client 2, defendant AVENATTI falsely represented to Client 2 that Individual 1 was not complying with the settlement agreement and falsely told Client 2 that defendant AVENATTI was working on obtaining the missing monthly settlement payments purportedly due to Client 2 from Individual 1.

iii. On or about March 24, 2019, at a meeting with Client 2 at defendant AVENATTI's residence in Los Angeles, California, defendant AVENATTI falsely represented to Client 2 that Client 2 would soon be receiving a payment from Individual 1 to make

13

1  up for the purportedly missing monthly settlement payments from
2  Individual 1 for July 2018 through March 2019.

3                    **Embezzlement of Client 3's Funds**

4           r.    Between on or about December 22, 2017, and on or about
5  December 28, 2017, defendant AVENATTI negotiated a settlement
6  agreement with Company 1 on behalf of Client 3.  The settlement
7  agreement required Company 1 to make an initial payment of $1,600,000
8  by January 10, 2018, and three additional payments of $100,000 by
9  January 10 of 2019, 2020, and 2021, respectively, for a total of
10 $1,900,000.  Client 3 was entitled to receive the initial $1,600,000
11 settlement payment, less EA LLP's attorneys' fees of $760,000 (i.e.,
12 40 percent of the total $1,900,000 settlement amount), costs, and
13 expenses.

14          s.    On or about December 28, 2017, at a meeting with
15 Client 3 at EA LLP's offices in Newport Beach, California, to discuss
16 the proposed settlement agreement with Company 1, defendant AVENATTI
17 provided an altered copy of the settlement agreement to Client 3 for
18 Client 3's review, which copy falsely represented the payment
19 schedule as $1,600,000 due by March 10, 2018, and $100,000 due by
20 March 10 of each of the three subsequent years.  That same day,
21 defendant AVENATTI emailed the attorney for Company 1 the signature
22 page for the actual settlement agreement, bearing Client 3's
23 signature.

24          t.    On or about December 29, 2017, defendant AVENATTI
25 received a complete copy of the fully executed settlement agreement
26 with Client 3's and Company 1's signatures from Company 1's attorney,
27 which included the payment schedule that had actually been negotiated
28 by defendant AVENATTI but had been concealed from Client 3, namely,

                                14

an initial $1,600,000 payment due by January 10, 2018, and additional payments of $100,000 due by January 10 of each of the three subsequent years.

u.  On or about January 2, 2018, defendant AVENATTI emailed instructions to Company 1's attorney to wire the initial $1,600,000 settlement payment to Avenatti Trust Account 5566.

v.  On or about January 5, 2018, as instructed by defendant AVENATTI, Company 1 wired the initial $1,600,000 settlement payment to Avenatti Trust Account 5566 to be held in trust for Client 3.  Defendant AVENATTI concealed and failed to disclose to Client 3 that defendant AVENATTI had received the initial $1,600,000 settlement payment from Company 1.  Further, defendant AVENATTI retained Client 3's portion of the $1,600,000 settlement payment and did not transfer Client 3's portion of the $1,600,000 settlement payment to Client 3.

w.  Between on or about January 5, 2018, and on or about March 14, 2018, defendant AVENATTI caused approximately $1,599,400 of the initial $1,600,000 settlement payment to be used for his own purposes, including to pay for expenses relating to GBUS.  Defendant AVENATTI concealed and failed to disclose to Client 3 that defendant AVENATTI used the settlement proceeds for his own purposes.

x.  In order to lull Client 3 and prevent Client 3 from discovering that defendant AVENATTI had embezzled Client 3's portion of the initial $1,600,000 settlement payment, defendant AVENATTI committed and caused to be committed the following acts:

i.  Between on or about March 10, 2018, and in or about November 2018, defendant AVENATTI falsely represented to Client 3 that Company 1 had not made the initial $1,600,000 settlement

15

1  payment, and that defendant AVENATTI was working on obtaining the

2  purportedly missing $1,600,000 settlement payment from Company 1.

3              ii.   Between in or about April 2018 and in or about

4  November 2018, defendant AVENATTI caused multiple payments totaling

5  approximately $130,000 to be paid to Client 3 and/or Client 3's

6  spouse, which payments defendant AVENATTI falsely claimed represented

7  "advances" on Client 3's portion of the $1,600,000 settlement payment

8  from Company 1, so that Client 3 could meet certain financial

9  obligations while Client 3 was purportedly "waiting" for his portion

10  of the $1,600,000 settlement payment from Company 1.

11              **Embezzlement of Client 4's Funds**

12              y.   On or about September 17, 2017, defendant AVENATTI

13  negotiated a "Common Stock Repurchase Agreement" with Company 2 on

14  behalf of Client 4 and Client 5.   Under the terms of Client 4's

15  Common Stock Repurchase Agreement, Company 2 agreed to repurchase

16  from Client 4 361,565 shares of Company 2 for approximately

17  $27,478,940, and thereafter an additional 107,188 shares of Company 2

18  for approximately $8,146,288, which resulted in a total repurchase

19  amount of approximately $35,625,228.

20              z.   On or about September 18, 2017, Company 2 wired

21  approximately $27,414,668 to Avenatti Trust Account 4705.

22  Approximately $2,787,651 of this amount constituted defendant

23  AVENATTI's and/or EA LLP's attorneys' fees (i.e., 7.5 percent of the

24  total $35,625,228 repurchase amount), costs, and expenses.   Between

25  on or about September 21, 2017, and on or about October 3, 2017,

26  defendant AVENATTI caused the remainder of the initial $27,414,668

27  payment to be transferred to bank accounts associated with Client 4.

28

aa. On or about March 13, 2018, after Company 2 informed Client 4 and Client 5 that Company 2 was ready to repurchase the remaining 107,188 shares of Company 2 from Client 4 as contemplated in the Common Stock Purchase Agreement, defendant AVENATTI told Client 5 that Company 2 should wire the remaining $8,146,288 payment due to Client 4 to Avenatti Trust Account 4705, and that defendant AVENATTI would then wire the $8,146,288 payment from Avenatti Trust Account 4705 to Client 4.

bb. On or about March 14, 2018, following defendant AVENATTI's instructions, Company 2 transferred approximately $8,146,288 to Avenatti Trust Account 4705 to be held in trust for Client 4. Defendant AVENATTI retained and did not transfer the $8,146,288 payment to Client 4 as defendant AVENATTI had promised to do.

cc. Between on or about March 15, 2018, and on or about May 4, 2018, defendant AVENATTI caused approximately $4,000,000 out of the $8,146,288 payment from Company 2 due to Client 4 to be used for defendant AVENATTI's own purposes, including the following:

i. On or about March 15, 2018, defendant AVENATTI caused approximately $3,000,000 of Client 4's funds to be transferred to EA Trust Account 4613. Later that same day, defendant AVENATTI then caused approximately $2,828,423 to be transferred from EA Trust Account 4613 to an attorney trust account for SulmeyerKupetz, a law firm representing A&A and defendant AVENATTI in bankruptcy proceedings involving EA LLP, so that SulmeyerKupetz could use the money to pay some of EA LLP's creditors in the bankruptcy proceedings, including the Internal Revenue Service.

17

1         ii.   Between on or about March 20, 2018, and on or

2 about May 1, 2018, defendant AVENATTI caused a total of approximately

3 $780,000 of Client 4's funds to be paid to EA Trust Account 4613,

4 which defendant AVENATTI then used for his own purposes, including

5 transferring the funds to bank accounts associated with defendant

6 AVENATTI's other companies, namely, GBUS, GB LLC, A&A, and Passport

7 420.

8         iii. Between on or about March 20, 2018, and May 1,

9 2018, defendant AVENATTI caused a total of approximately $260,000 of

10 Client 4's funds to be paid to EA DIP Account 0313.

11         iv.   In order to lull Client 1 and prevent Client 1

12 from discovering that defendant AVENATTI had embezzled Client 1's

13 portion of the $4,000,000 settlement payment from the County of Los

14 Angeles, on or about April 9, 2018, defendant AVENATTI used Client

15 4's funds, which had been transferred from Avenatti Trust Account

16 4705 to EA DIP Account 0313 and then to EA Trust Account 4613, to

17 make an approximately $1,900 payment to Client 1.

18         v.   In order to lull Client 2 and prevent Client 2

19 from discovering that defendant AVENATTI had embezzled Client 2's

20 portion of the $2,750,000 settlement payment from Individual 1, on or

21 about April 17, 2018, defendant AVENATTI used Client 4's funds, which

22 had been transferred from Avenatti Trust Account 4705 to EA Trust

23 Account 4613, to make an approximately $34,000 payment to Client 2.

24         dd.   Between on or about March 14, 2018, and on or about

25 May 3, 2018, defendant AVENATTI failed to disclose to Client 4 and

26 Client 5 that defendant AVENATTI had used approximately $4,000,000 of

27 Client 4's funds for defendant AVENATTI's own purposes.

28

1    ee.   In order to lull Client 4 and Client 5 and prevent

2  them from discovering that defendant AVENATTI had embezzled

3  approximately $4,000,000 from the approximately $8,146,288 payment

4  defendant AVENATTI received from Company 2, between on or about

5  March 14, 2018, and on or about May 3, 2018, defendant AVENATTI

6  falsely represented and promised Client 4 and Client 5 that defendant

7  AVENATTI would transfer Client 4's funds to Client 4 at a later date,

8  and that defendant AVENATTI needed to go to the bank to fill out

9  paperwork to effectuate the wire transfers.  In truth and in fact, as

10  defendant AVENATTI then well knew, he had already caused

11  approximately $4,000,000 of Client 4's funds to be transferred or

12  paid to other bank accounts defendant AVENATTI controlled, and then

13  used for defendant AVENATTI's own purposes.

14    ff.   In order to lull Client 4 and Client 5 and prevent

15  them from discovering that he had embezzled approximately $4,000,000

16  of Client 4's funds, on or about May 4, 2018, defendant AVENATTI

17  caused two wire transfers in the amounts of $4,000,000 and $146,288

18  to be sent from Avenatti Trust Account 4705 to a bank account

19  associated with Client 4.  Defendant AVENATTI retained and failed to

20  transfer to Client 4 the remainder of the $8,146,288 payment that

21  Company 2 had transferred on or about March 14, 2018, to Avenatti

22  Trust Account 4705 for the benefit of Client 4.

23    gg.   Between on or about May 4, 2018, and on or about

24  June 4, 2018, defendant AVENATTI and another attorney with whom

25  defendant AVENATTI worked ("Attorney 1") falsely represented to

26  Client 4 and Client 5 that the entire $8,146,288 payment from Company

27  2 had been transferred to Client 4 in three separate wire transfers.

28  For example, in response to a request from Client 5 that defendant

19

1  AVENATTI provide the wire transfer information for the remaining

2  $4,000,000 of Client 4's funds, on or about May 11, 2018, defendant

3  AVENATTI emailed Attorney 1 a wire transfer confirmation document

4  purporting to reflect a second $4,000,000 wire transfer to Client 4.

5  In truth and in fact, as defendant AVENATTI then well knew, defendant

6  AVENATTI had never transferred the remaining $4,000,000 to Client 4,

7  defendant AVENATTI had already used the remaining $4,000,000 for his

8  own purposes, and the wire transfer confirmation document that

9  defendant AVENATTI provided on or about May 11, 2018, related to the

10 first $4,000,000 wire transfer from Avenatti Trust Account 4705 that

11 Client 4 had already received on May 4, 2018.

12 **D.   THE USE OF THE WIRES**

13      8.   On or about the following dates, within the Central

14 District of California, and elsewhere, defendant AVENATTI, for the

15 purpose of executing the above-described scheme to defraud,

16 transmitted and caused to be transmitted by means of wire and radio

17 communications in interstate commerce the following items:

| COUNT | DATE | ITEM WIRED |
|---|---|---|
| ONE | 1/30/2015 | Wire transfer of approximately $250,000 sent from A&A Account 0661 through the Fedwire system to GBUS's Homestreet bank account in Seattle, Washington. |
| TWO | 2/10/2015 | Wire transfer of approximately $50,000 from A&A Account 0661 through the Fedwire system to defendant AVENATTI's personal Bank of America bank account. |
| THREE | 1/26/2017 | Wire transfer of approximately $2,500,000 from EA Trust Account 8671 through the Fedwire system to Law Firm 1's JP Morgan Chase Bank, N.A. ("Chase") IOLTA trust account. |

| COUNT | DATE | ITEM WIRED |
|---|---|---|
| FOUR | 1/5/2018 | Wire transfer of approximately $1,600,000 sent from Company 1's Silicon Valley Bank account through the Fedwire system to Avenatti Trust Account 5566. |
| FIVE | 1/10/2018 | Wire transfer of approximately $60,000 sent from Avenatti CNB Trust Account 5566 through the Fedwire system to EA Trust Account 3714. |
| SIX | 3/15/2018 | Wire transfer of approximately $3,000,000 from Avenatti Trust Account 4705 through the Fedwire system to EA CB&T Trust Account 4613. |
| SEVEN | 3/15/2018 | Wire transfer of approximately $2,828,423 from EA CB&T Trust Account 4613 through the Fedwire system to an attorney trust account for SulmeyerKupetz at CNB. |
| EIGHT | 3/20/2018 | Wire transfer of approximately $200,000 from Avenatti CNB Trust Account 4705 through the Fedwire system to EA Trust Account 4613. |
| NINE | 6/18/2018 | Wire transfer of approximately $16,000 from EA Trust Account 4613 through the Fedwire system to Client 2's Chase bank account. |
| TEN | 7/13/2018 | Wire transfer of approximately $1,900 from EA Trust Account 4613 through the Fedwire system to Client 1's Bank of America bank account. |

COUNTS ELEVEN THROUGH EIGHTEEN

[26 U.S.C. § 7202; 18 U.S.C. § 2(b)]

**A. INTRODUCTORY ALLEGATIONS**

**Background**

9. The Grand Jury re-alleges and incorporates by reference paragraph 1 through 7 of this Indictment as though fully set forth herein.

10. At all relevant times:

a. GBUS was a limited liability company organized in Washington, which operated Tully's stores in Washington and California. Until in or around November 2017, GBUS's corporate office was in Seattle, Washington.

b. GB LLC was a limited liability company organized in Washington. Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was the sole managing member of GB LLC.

c. GB Auto was a limited liability company organized in Washington. Defendant AVENATTI was the sole manager of GB Auto.

d. Doppio, Inc. ("Doppio") was a for-profit corporation incorporated in Washington. Defendant AVENATTI was the sole governor of Doppio.

e. Defendant AVENATTI was the effective owner of GBUS. In or around June 2013, defendant AVENATTI's company GB LLC acquired TC Global Inc., which previously operated Tully's, at a bankruptcy auction for approximately $9.15 million, namely, $6.95 million in cash and $2.2 million in assumed liabilities. On or about June 25, 2013, defendant AVENATTI caused a wire transfer in the amount of $7,000,000 from EA Trust Account 8541 to a bank account for Foster Pepper PLLC, the law firm representing GB LLC in Tully's bankruptcy

22

1  auction.  A&A owned 100 percent of Doppio, which in turn owned at
2  least 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled
3  the day-to-day business operations of Tully's.

4          f.    Defendant AVENATTI served as GBUS's CEO, for which he
5  was paid a yearly salary of approximately $250,000.  As GBUS's CEO,
6  defendant AVENATTI exercised control over every aspect of GBUS's
7  business affairs, including approving payments GBUS made and
8  controlling GBUS's bank accounts.  Defendant AVENATTI managed and
9  exercised control over GBUS's business affairs from Orange and Los
10 Angeles Counties, within the Central District of California, and
11 elsewhere.

12         g.    The Internal Revenue Service ("IRS") was an agency of
13 the United States within the Department of Treasury of the United
14 States and was responsible for enforcing and administering the tax
15 laws of the United States.

16     11.   Beginning in or about February 2015 and continuing until at
17 least in or about July 2018, GBUS maintained multiple bank accounts
18 at CB&T in Orange County, California, including GBUS's payroll
19 account ending in x2976 ("GBUS Payroll Account 2976") and GBUS
20 Operating Account 2240.  Defendant AVENATTI and an EA LLP employee
21 ("EA Employee 1") were the only signatories on GBUS Payroll Account
22 2976 and GBUS Operating Account 2240.

23     12.   In addition to defendant AVENATTI's yearly salary as GBUS's
24 CEO, between as early as in or about September 2015 and continuing
25 until at least in or about December 2017, defendant AVENATTI caused
26 GBUS to make substantial payments for defendant AVENATTI's personal
27 benefit and the benefit of other entities defendant AVENATTI

28

1  controlled, while, at the same time, failing to pay over to the IRS
2  payroll taxes withheld from GBUS employees' paychecks.  For example:

3         a.   Between on or about September 1, 2015, and on or about
4  December 31, 2017, defendant AVENATTI caused a net of approximately
5  $2.5 million to be transferred from GBUS's and GB LLC's bank accounts
6  to bank accounts associated with A&A and EA LLP.

7         b.   On or about March 30, 2016, defendant AVENATTI caused
8  GBUS to transfer $200,000 to the G.P. Family Trust as payment for two
9  months of rent for defendant AVENATTI's residence in Newport Beach,
10  California.

11         c.   In order to lull Client 1 and prevent Client 1 from
12  discovering that defendant AVENATTI had embezzled Client 1's portion
13  of the $4,000,000 settlement payment from the County of Los Angeles,
14  on or about April 7, 2016, defendant AVENATTI used GBUS funds, which
15  had been transferred from GBUS Account 2240 to EA Account 2851, to
16  make an approximately $1,900 payment to Client 1.

17         d.   In order to lull Client 2 and prevent Client 2 from
18  discovering that defendant AVENATTI had embezzled Client 2's portion
19  of the initial $2,750,000 settlement payment from Individual 1,
20  defendant AVENATTI caused GBUS funds to be used to make payments to
21  Client 2, including the following:

22              i.   On or about April 14, 2017, defendant AVENATTI
23  used GBUS funds, which had been transferred from GBUS Account 2240 to
24  A&A Account 0661, to make an approximately $16,000 payment to Client
25  2.

26              ii.  On or about May 15, 2017, defendant AVENATTI used
27  GBUS funds, which had been transferred from GBUS Account 2240 to A&A
28  Account 0661, to make an approximately $16,000 payment to Client 2.

24

## Federal Payroll Taxes

13.   At all relevant times:

   a.   Title 26 of the United States Code imposed four types of tax with respect to wages paid to employees:  (1) income tax; (2) Social Security tax; (3) Medicare tax; and (4) federal unemployment tax (collectively, "payroll taxes").

   b.   Federal income tax was imposed upon employees based upon the amount of wages they received.

   c.   Social Security tax and Medicare tax were imposed by the Federal Insurance Contributions Act (collectively referred to as "FICA taxes").  FICA taxes were imposed separately on employees and on employers.

   d.   Federal unemployment tax was imposed under the Federal Unemployment Tax Act ("FUTA").  FUTA taxes were imposed solely on employers.

## GBUS's Obligation to Collect, Truthfully Account For, and
## Pay Over to the IRS Federal Payroll Taxes

14.   At all relevant times:

   a.   GBUS was required to withhold employee income taxes and FICA taxes from the wages paid to its employees, and to pay over the withheld amounts to the IRS.  The employee income taxes and FICA taxes that GBUS was required to withhold and pay over to the IRS were commonly referred to as "trust fund taxes" because of the provision in the Internal Revenue Code requiring that such taxes "shall be held to be a special fund in trust for the United States."

   b.   GBUS was required to make deposits of payroll taxes, including trust fund taxes, to the IRS on a periodic basis.  In addition, GBUS was required to file, following the end of each

1  calendar quarter, an Employer's Quarterly Federal Tax Return (Form

2  941), setting forth for the quarter the total amount of wages and

3  other compensation subject to withholding paid by GBUS, the total

4  amount of income tax withheld, the amount of Social Security and

5  Medicare taxes (i.e., FICA taxes) due, and the total federal tax

6  deposits.

7      c.  Defendant AVENATTI was a "responsible person" for

8  GBUS, that is, defendant AVENATTI had the corporate responsibility to

9  collect, truthfully account for, and pay over to the IRS GBUS's

10  payroll taxes.

11     15.  Beginning in or about June 2013 and continuing until at

12  least in or about October 2017, GBUS withheld tax payments from its

13  employees' paychecks, including federal income taxes and FICA taxes.

14     16.  Beginning in or about September 2015 and continuing until

15  at least in or about October 2017, GBUS failed to pay over to the IRS

16  payroll taxes due and owing, including federal income taxes and FICA

17  taxes GBUS withheld from its employees' paychecks.  In total, between

18  in or around September 2015 and in or around October 2017, GBUS

19  failed to pay over to the IRS at least approximately $3,207,144 in

20  federal payroll taxes, including at least approximately $2,390,048 in

21  trust fund taxes that GBUS withheld from its employees' paychecks.

22     17.  Beginning in or about January 2016 and continuing until at

23  least in or about October 2017, GBUS failed to timely file its

24  quarterly employment tax returns (Forms 941) with the IRS for the

25  fourth quarter of 2015 through the third quarter of 2017, inclusive.

26  **B.  FAILURE TO ACCOUNT FOR AND PAY OVER PAYROLL TAXES**

27     18.  Beginning in or about October 2015 and continuing until at

28  least on or about October 31, 2017, in Orange County, within the

26

1  Central District of California, and elsewhere, defendant AVENATTI, a

2  responsible person of GBUS, willfully failed and willfully caused

3  GBUS to fail to pay over to the United States, namely, the IRS, all

4  of the federal income taxes and FICA taxes (i.e., trust fund taxes)

5  that GBUS withheld from GBUS employees' total taxable wages, which

6  were due and owing to the United States by the dates set forth below

7  and in the amounts set forth below, for each of the following

8  calendar year quarters:

| COUNT | QUARTER AND YEAR | QUARTERLY DUE DATE | APPROXIMATE TRUST FUND TAXES DUE AND OWING |
|---|---|---|---|
| ELEVEN | Fourth Quarter of 2015 | 1/31/2016 | $292,724 |
| TWELVE | First Quarter of 2016 | 4/30/2016 | $382,100 |
| THIRTEEN | Second Quarter of 2016 | 7/31/2016 | $297,791 |
| FOURTEEN | Third Quarter of 2016 | 10/31/2016 | $333,969 |
| FIFTEEN | Fourth Quarter of 2016 | 1/31/2017 | $277,681 |
| SIXTEEN | First Quarter of 2017 | 4/30/2017 | $309,702 |
| SEVENTEEN | Second Quarter of 2017 | 7/31/2017 | $345,094 |
| EIGHTEEN | Third Quarter of 2017 | 10/31/2017 | $150,989 |

COUNT NINETEEN

[26 U.S.C. § 7212(a)]

A.  **INTRODUCTORY ALLEGATIONS**

19.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 10 through 17 of this Indictment as though fully set forth herein.

20.  In or about September 2016, the IRS initiated a collection action relating to GBUS's failure to file its quarterly employment tax returns (Forms 941) and pay over to the IRS payroll taxes that were due and owing, including federal income taxes and FICA taxes that GBUS had withheld (collectively, "trust fund taxes") from GBUS employees' paychecks.

21.  On or about October 7, 2016, an IRS Revenue Officer ("IRS RO-1") spoke with defendant MICHAEL JOHN AVENATTI ("AVENATTI") and other GBUS employees regarding the IRS's collection action and advised them that since approximately September 2015 GBUS had not paid over to the IRS any federal payroll taxes.

22.  On or about June 26, 2017, IRS RO-1 filed a notice of federal tax lien against GBUS in King County in the State of Washington.  The federal tax lien indicated that GBUS owed the IRS approximately $4,998,227 in unpaid federal payroll taxes.  A copy of the federal tax lien notice was also mailed to GBUS.

23.  Between in or about August 2017 and in or about January 2018, IRS RO-1 issued levy notices to a number of financial institutions and companies associated with GBUS.  The levy notices indicated that GBUS owed the IRS as much as approximately $5,210,769. Each levy notice required the recipient of the levy notice to turn over to the United States Treasury GBUS's property and rights to

28

1  property, such as money, credits, and bank deposits, that the

2  recipient of the levy had or was already obligated to pay to GBUS.

3  Banks, savings and loans, and credit unions were obligated to hold

4  any funds subject to the levy notices for 21 days before sending

5  payment to the United States Treasury.  Copies of the levy notices

6  issued by IRS RO-1 were mailed to GBUS.

7      24.  Beginning as early as in or about August 2017, defendant

8  AVENATTI knew that the IRS had issued levies to certain financial

9  institutions at which GBUS maintained bank accounts.

10  **B.  THE ATTEMPT TO OBSTRUCT AND IMPEDE THE ADMINISTRATION OF THE**

11  **INTERNAL REVENUE LAWS**

12      25.  Beginning on or about October 7, 2016, and continuing until

13  at least in or around September 2018, in Orange and Los Angeles

14  Counties, within the Central District of California, and elsewhere,

15  defendant AVENATTI corruptly obstructed and impeded, and corruptly

16  endeavored to obstruct and impede, the due administration of the

17  internal revenue laws of the United States.

18      26.  The attempt to obstruct and impede the due administration

19  of the internal revenue laws of the United States operated, in

20  substance, in the following manner:

21          a.  On or about October 7, 2016, defendant AVENATTI made

22  false statements to IRS RO-1 in connection with the IRS's collection

23  action, including that:  (i) defendant AVENATTI was not personally

24  involved in GBUS's finances; and (ii) defendant AVENATTI was unaware

25  that since approximately September 2015 GBUS had failed to pay over

26  to the IRS any federal payroll taxes.  In truth and in fact, as

27  defendant AVENATTI then well knew, (i) defendant AVENATTI was

28  personally involved in GBUS's finances in that he had authority to

29

1 approve payments on behalf of GBUS and had control over GBUS's bank

2 accounts; and (ii) defendant AVENATTI was aware that since

3 approximately September 2015 GBUS had failed to pay over to the IRS

4 any federal payroll taxes because, among other reasons, on or about

5 November 5, 2015, GBUS's controller had sent defendant AVENATTI an

6 email explaining to defendant AVENATTI the "implications" of GBUS not

7 paying to the IRS its payroll taxes in a timely manner, and, between

8 in or about September 2015 and in or about October 2016, defendant

9 AVENATTI had refused to authorize GBUS to pay over to the IRS the

10 federal payroll taxes that GBUS had withheld from its employees'

11 paychecks.

12         b.    In order to further obstruct and impede the IRS's

13 collection action and the IRS's efforts to collect the payroll taxes

14 that GBUS owed to the IRS, defendant AVENATTI directed GBUS employees

15 to stop depositing cash receipts from the Tully's stores into GBUS

16 KeyBank Account 6193, which defendant AVENATTI knew was already

17 subject to IRS levy notices, and instructed GBUS employees to instead

18 deposit all cash receipts from Tully's stores into a little-used Bank

19 of America account for a separate entity defendant AVENATTI

20 controlled, GB Auto.  Defendant AVENATTI did so by, among other acts,

21 the following:

22         i.    In or about September 2017, defendant AVENATTI

23 directed and instructed a GBUS employee ("GBUS Employee 1") to tell

24 the Tully's stores that the stores could no longer make cash deposits

25 into GBUS KeyBank Account 6193 and should hold all of the stores'

26 cash deposits.

27         ii.    On or about September 7, 2017, defendant

28 AVENATTI sent GBUS Employee 1 a text message containing the bank

account information for the GB Auto account at Bank of America (the "GB Auto Account"), in order to cause the cash deposits from the Tully's stores to be made into the GB Auto Account.

iii. On or about September 18, 2017, after receiving a text message from GBUS Employee 1 asking if the Tully's stores were able to deposit at KeyBank yet, defendant AVENATTI responded via text message "Not yet but hopefully in next two days. Can you collect deposits tmrw and deposit pls?"

iv. On or about September 28, 2017, defendant AVENATTI sent a text message to GBUS Employee 1 and another GBUS employee ("GBUS Employee 2"), asking, "When are we depositing again?" and, later that same day, another text message, stating, "It is important that these deposits be made regularly. Thanks."

v. Between on or about September 7, 2017, and in or about December 2017, GBUS Employee 1, acting at defendant AVENATTI's direction, made approximately 27 cash deposits totaling approximately $859,784 into the GB Auto Account. After approximately 24 of the cash deposits, GBUS Employee 1 sent defendant AVENATTI a text message attaching a photograph of the deposit slip.

c. In order to further obstruct and impede the IRS's collection action and the IRS's efforts to collect the payroll taxes that GBUS owed to the IRS, defendant AVENATTI caused GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts ("merchant accounts"), which defendant AVENATTI knew were already subject to IRS levy notices. Defendant AVENATTI did so by, among other acts, the following:

31

1                i.   On or about September 28, 2017, defendant

2 AVENATTI received an email from GBUS Employee 2, which stated, among

3 other things, "9.25.17 tsys - $22,135.19 IRS levy."

4                ii.  On or about September 29, 2017, defendant

5 AVENATTI received an email from GBUS Employee 2 titled "Levies,"

6 which stated that "IRS took as [sic] additional $23,763.02 from tsys

7 yesterday."

8                iii. On or about September 29, 2017, defendant

9 AVENATTI directed a TSYS representative ("TSYS Rep. 1") to change the

10 company name associated with the merchant accounts from "Global

11 Baristas US LLC" to "Global Baristas, LLC" and to change the EIN from

12 GBUS's EIN to GB LLC's EIN.

13                iv.  On or about October 2, 2017, defendant AVENATTI

14 sent TSYS Rep. 1 an email regarding changes to the merchant accounts

15 and said "we need this done ASAP."

16                v.   On or about October 3, 2017, defendant AVENATTI

17 entered into a new Merchant Transaction Processing Agreement with

18 TSYS on behalf of GB LLC.

19                vi.  On or about October 3, 2017, defendant AVENATTI

20 and EA Employee 1 opened a new bank account, GB LLC Account 3730, for

21 GB LLC at CB&T in Orange County, California.  Later that day, EA LLP

22 Employee 1 emailed TSYS Rep. 1 the bank account and routing number

23 for GB CB&T Account 3730, which was to be the new bank account into

24 which the proceeds of the credit card transactions were to be

25 deposited.

26              d.   In order to further obstruct and impede the IRS's

27 collection action and the IRS's efforts to collect the payroll taxes

28 that GBUS owed to the IRS, in or about December 2017, after TSYS

32

1  closed GBUS and GB LLC's merchant accounts, defendant AVENATTI caused
2  GBUS to open new merchant accounts with Chase for the Tully's stores
3  under the name GB LLC and directed Chase to deposit all credit card
4  receipts in to GB LLC Account 3730.

5          e.    In order to further obstruct and impede the IRS's
6  efforts to collect the payroll taxes that GBUS owed to the IRS,
7  defendant AVENATTI changed the name of the contracting party on
8  various contracts with The Boeing Company ("Boeing"), which had
9  agreed to allow GBUS to operate Tully's stores at Boeing facilities
10 in Washington.  Defendant AVENATTI did so by, among other acts, the
11 following:

12         i.    In or about November 2016, approximately one
13 month after defendant AVENATTI learned of the IRS's collection
14 action, defendant AVENATTI caused the contracting party's name on a
15 contract with Boeing to be changed from "Global Baristas US LLC" to
16 "GB Hospitality LLC," even though, as defendant AVENATTI then well
17 knew, GBUS operated the Tully's stores at the Boeing facilities and
18 "GB Hospitality LLC" had never been registered with any government
19 agency and had never operated.

20         ii.   In or about September 2017 and in or about
21 October 2017, after IRS RO-1 had issued levy notices to Boeing and
22 numerous financial institutions at which GBUS maintained accounts,
23 defendant AVENATTI, having agreed on behalf of GBUS to sell Boeing
24 two Tully's coffee kiosks and other Tully's equipment in exchange for
25 a payment from Boeing of approximately $155,010 and forgiveness of
26 certain debts, directed a Boeing attorney to change the seller's name
27 from "GB Hospitality, LLC" to "Global Baristas, LLC" on the two bills
28 of sales relating to the transaction.  Defendant AVENATTI further

1  instructed Boeing to transfer the approximately $155,010 payment to

2  EA Trust Account 8671, rather than to GBUS's bank account.  Defendant

3  AVENATTI then transferred the approximately $155,010 payment from EA

4  Trust Account 8671 to A&A Account 0661, from which defendant AVENATTI

5  used a substantial portion of the proceeds of the sale for defendant

6  AVENATTI's personal purposes, including to: (1) transfer

7  approximately $15,000 to a personal bank account; (2) pay

8  approximately $13,073 for rent at defendant AVENATTI's residential

9  apartment in Los Angeles, California; and (3) pay approximately

10  $8,459 that defendant AVENATTI owed to Neiman Marcus.

11          f.  After learning of the IRS's collection action,

12  defendant AVENATTI used GBUS funds that should and could have been

13  used to pay over to the IRS federal incomes taxes and FICA taxes that

14  had been withheld from GBUS employees' paychecks for his own personal

15  benefit and the benefit of other entities defendant AVENATTI

16  controlled, including, but not limited to, the following:

17          i.  Between in or about October 2016 and in or about

18  December 2017, defendant AVENATTI caused a net of approximately $1.6

19  million to be transferred from GBUS's and GB LLC's bank accounts to

20  bank accounts associated with defendant AVENATTI's other companies,

21  namely, A&A and EA LLP.

22          ii.  In order to lull Client 1 and prevent Client 1

23  from discovering that defendant AVENATTI had embezzled Client 1's

24  portion of the $4,000,000 settlement payment from the County of Los

25  Angeles, defendant AVENATTI used GBUS funds, including credit card

26  receipts from Tully's stores that Chase deposited into GB LLC Account

27  3730, to make the following additional payments to Client 1:

28

1                  (I)  On or about January 19, 2018, defendant
2 AVENATTI used GBUS funds, which had been transferred from GB LLC
3 Account 3730 and/or KeyBank Account 6193 to EA Trust Account 3714, to
4 make an approximately $1,900 payment to Client 1.

5                (II) On or about February 15, 2018, defendant
6 AVENATTI used GBUS funds, which had been transferred from GB LLC
7 Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account
8 4613, to make an approximately $1,900 payment to Client 1.

9           iii. In order to lull Client 2 and prevent Client 2
10 from discovering that defendant AVENATTI had embezzled Client 2's
11 portion of the initial $2,750,000 settlement payment from Individual
12 1, defendant AVENATTI used GBUS funds, including credit card receipts
13 from Tully's stores that Chase deposited into GB LLC Account 3730, to
14 make the following additional payments to Client 2:

15                (I)  On or about January 16, 2018, defendant
16 AVENATTI used GBUS funds, which had been transferred from GB LLC
17 Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account
18 3714, to make an approximately $16,000 payment to Client 2.

19                (II) On or about February 20, 2018, defendant
20 AVENATTI used GBUS funds, which had been transferred from GB LLC
21 Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account
22 4613, to make an approximately $16,000 payment to Client 2.

COUNTS TWENTY THROUGH TWENTY-THREE

[26 U.S.C. § 7203]

**A.    INTRODUCTORY ALLEGATIONS**

27.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, and 26 of this Indictment as though fully set forth herein.

28.    On or about October 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed his U.S. Individual Income Tax Return (Form 1040) for the 2009 calendar year, which claimed defendant AVENATTI had total income of $1,939,942 and that defendant AVENATTI owed the IRS approximately $569,630 in taxes for the 2009 calendar year.  Defendant AVENATTI, however, did not pay the remaining tax due for the 2009 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

29.    On or about October 11, 2011, defendant AVENATTI filed his U.S. Individual Income Tax Return (Form 1040) for the 2010 calendar year, which claimed defendant AVENATTI had total income of $1,154,800 and that defendant AVENATTI owed the IRS approximately $281,786 in taxes for the 2010 calendar year.  Defendant AVENATTI, however, did not pay the remaining taxes due to the IRS for the 2010 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

30.    The 2010 Form 1040 was the last U.S. Individual Income Tax Return defendant AVENATTI filed with the IRS.

**B.    THE WILLFUL FAILURES TO FILE TAX RETURNS**

31.    During the calendar years set forth below, defendant AVENATTI, who resided in Orange and Los Angeles Counties, within the

36

Central District of California, had and received gross income in excess of the amounts ("threshold gross income amounts") set forth below. By reason of such gross income, defendant AVENATTI was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an income tax return to the IRS Center, at Fresno, California, to a person assigned to receive returns at the local office of the IRS in the Central District of California, or to another IRS officer permitted by the Commissioner of the Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Well knowing and believing all of the foregoing, defendant AVENATTI willfully failed, on or about the due dates set forth below, in the Central District of California and elsewhere, to make an income tax return.

| COUNT | CALENDAR YEAR | THRESHHOLD GROSS INCOME AMOUNT | DUE DATE |
|-------|---------------|-------------------------------|----------|
| TWENTY | 2014 | $20,300 | October 15, 2015, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-ONE | 2015 | $20,600 | October 17, 2016, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-TWO | 2016 | $20,700 | April 15, 2017 |
| TWENTY-THREE | 2017 | $20,800 | April 16, 2018 |

COUNTS TWENTY-FOUR THROUGH TWENTY-SIX

[26 U.S.C. § 7203]

A.  **INTRODUCTORY ALLEGATIONS**

32.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, and 28 through 30 of this Indictment as though fully set forth herein.

33.  On or about March 17, 2014, EA LLP filed its 2011 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant MICHAEL JOHN AVENATTI ("AVENATTI") signed the return on or about March 12, 2014, as the general partner or member manager.  The return listed A&A as the designated Tax Matters Partner ("TMP") before the IRS, and defendant AVENATTI as the TMP representative.

34.  On or about October 8, 2014, EA LLP filed its 2012 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant AVENATTI signed the return on or about October 1, 2014, as the general partner or member manager.  The return listed A&A as the designated TMP before the IRS.

35.  The 2012 Form 1065 for EA LLP was the last U.S. Return of Partnership Income for EA LLP filed with the IRS.

B.  **THE WILLFUL FAILURES TO FILE TAX RETURNS**

36.  During the calendar years set forth below, defendant AVENATTI conducted a business as a partnership under the name of EA LLP, with its principal place of business in Orange County, within the Central District of California.  Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make, for and on behalf of the partnership, a partnership return of income to the IRS Center, at Ogden, Utah, to a person

38

1  assigned to receive returns at the local office of the IRS in the

2  Central District of California, or to another IRS officer permitted

3  by the Commissioner of the Internal Revenue, stating specifically the

4  items of the partnership's gross income and the deductions and

5  credits allowed by law.  Well knowing and believing all of the

6  foregoing, defendant AVENATTI willfully failed, on or about the due

7  dates set forth below, in the Central District of California and

8  elsewhere, to make a partnership return.

| COUNT | CALENDAR YEAR | DUE DATE |
|-------|---------------|----------|
| TWENTY-FOUR | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-FIVE | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-SIX | 2017 | March 15, 2018. |

COUNTS TWENTY-SEVEN THROUGH TWENTY-NINE

[26 U.S.C. § 7203]

A.   **INTRODUCTORY ALLEGATIONS**

37.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, 28 through 30, and 33 through 35 of this Indictment as though fully set forth herein.

38.   On or about September 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed a 2009 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $3,391,224 and ordinary business income of $1,578,558 for the 2009 calendar year.  The return listed defendant AVENATTI as the President of A&A.

39.   On or about September 30, 2011, defendant AVENATTI filed a 2010 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $1,421,028 and ordinary business income of $821,634 for the 2010 calendar year.  The return listed defendant AVENATTI as the President of A&A.

40.   The 2010 Form 1120S for A&A was the last U.S. Income Tax Return for an S Corporation (Form 1120S) that defendant AVENATTI filed for A&A with the IRS.

B.   **THE WILLFUL FAILURE TO FILE TAX RETURN**

41.   During the calendar years set forth below, defendant AVENATTI was the President and CEO of A&A, with its principal place of business in Orange County, within the Central District of California.  Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an

40

1  income tax return, for and on behalf of the corporation, to the IRS

2  Center, at Ogden, Utah, to a person assigned to receive returns at

3  the local office of the IRS in the Central District of California, or

4  to another IRS officer permitted by the Commissioner of the Internal

5  Revenue, stating specifically the items of the corporation's gross

6  income and the deductions and credits allowed by law.  Well knowing

7  and believing all of the foregoing, defendant AVENATTI willfully

8  failed, on or about the due dates set forth below, in the Central

9  District of California and elsewhere, to make an income tax return at

10 the time required by law.

| COUNT | CALENDAR YEAR | DUE DATE |
|-------|---------------|----------|
| TWENTY-SEVEN | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-EIGHT | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-NINE | 2017 | March 15, 2018. |

41

COUNTS THIRTY AND THIRTY-ONE

[18 U.S.C. §§ 1344(1), 2(b)]

**A.    INTRODUCTORY ALLEGATIONS**

42.    The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, and 38 through 40 of this Indictment as though fully set forth herein.

43.    Between in or about January 2014 and in or about April 2016, defendant MICHAEL JOHN AVENATTI ("AVENATTI") operated and controlled GB LLC and EA LLP from EA LLP's offices in Newport Beach, California.

44.    At all times relevant to this Indictment, The Peoples Bank was a financial institution located in Biloxi, Mississippi, the accounts and deposits of which were insured by the Federal Deposit Insurance Corporation.

**B.    THE SCHEME TO DEFRAUD**

45.    Beginning in or about January 2014, and continuing through in or about April 2016, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed and attempted to execute a scheme to defraud The Peoples Bank as to material matters.

46.    The fraudulent scheme operated, in substance, in the following manner:

a.    Between in or about January 2014 and in or about December 2014, defendant AVENATTI sought and obtained the following three loans from The Peoples Bank on behalf of the following companies that defendant AVENATTI controlled:

42

1            i.    In or about January 2014, defendant AVENATTI

2    sought and obtained a $850,000 loan to GB LLC (the "January 2014 GB

3    LLC Loan");

4            ii.   In or about March 2014, defendant AVENATTI sought

5    and obtained a $2,750,000 loan to EA LLP (the "March 2014 EA LLP

6    Loan"), from which defendant AVENATTI used approximately $884,166 to

7    pay off the January 2014 GB LLC Loan; and

8            iii. In or about December 2014, defendant AVENATTI

9    sought and obtained a $500,000 loan to EA LLP (the "December 2014 EA

10   LLP Loan").

11       b.   In order to obtain the March 2014 EA LLP Loan and the

12   December 2014 EA LLP Loan from The Peoples Bank, defendant AVENATTI

13   omitted and concealed material facts, and provided The Peoples Bank

14   with materially false financial information, including, but not

15   limited to, false and fraudulent individual and partnership tax

16   returns, and false and fraudulent balance sheets and financial

17   statements, as described below.

18       c.   In support of the application for the March 2014 EA

19   LLP Loan, defendant AVENATTI submitted to The Peoples Bank a 2011

20   U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2011

21   Form 1040") stating that defendant AVENATTI had an adjusted gross

22   income for the 2011 calendar year of approximately $4,562,881, and

23   had a tax due and owing to the IRS for the 2011 calendar year of

24   approximately $1,506,707.  In truth and in fact, as defendant

25   AVENATTI then well knew, defendant AVENATTI had not filed the Peoples

26   Bank 2011 Form 1040 with the IRS, had not filed any 2011 U.S.

27   Individual Income Tax Return with the IRS, and had not paid to the

28

1 IRS the $1,506,707 defendant AVENATTI purportedly owed for the 2011

2 calendar year.

3       d. In support of the application for the March 2014 EA

4 LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to

5 The Peoples Bank a personal financial statement as of March 11, 2014,

6 in which defendant AVENATTI failed to disclose to The Peoples Bank

7 that defendant AVENATTI still owed the IRS approximately $850,438 in

8 unpaid personal income taxes, plus interest and penalties, for the

9 2009 and 2010 calendar years.

10       e. In support of the application for the March 2014 EA

11 LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to

12 The Peoples Bank a Balance Sheet for January 2014 through March 10,

13 2014 for EA LLP, which stated, among other things, that EA LLP had

14 approximately $508,299 in its operating account, EA Account 8461, as

15 of March 10, 2014. In truth and in fact, as defendant AVENATTI then

16 well knew, the balance in EA Account 8461 as of March 10, 2014, was

17 approximately $43,013.

18       f. In support of the application for the March 2014 EA

19 LLP Loan, on or about March 13, 2014, defendant AVENATTI submitted to

20 The Peoples Bank a 2012 U.S. Partnership Return (Form 1065) for EA

21 LLP (the "Peoples Bank 2012 Form 1065"), which stated that in the

22 2012 calendar year EA LLP had total income of approximately

23 $11,426,021, and ordinary business income of approximately

24 $5,819,458. In truth and in fact, as defendant AVENATTI then well

25 knew, the Peoples Bank 2012 Form 1065, had not been filed with the

26 IRS. Rather, in or about October 2014, defendant AVENATTI caused a

27 different 2012 U.S. Partnership Return (Form 1065) to be filed with

28

1  the IRS (the "IRS 2012 Form 1065"), which differed materially from
2  the Peoples Bank 2012 EA 1065 in the following ways:

3         i.    The Peoples Bank 2012 Form 1065 stated that in
4  the 2012 calendar year EA LLP had total income of approximately
5  $11,426,021, whereas the IRS 2012 Form 1065 stated that in the 2012
6  calendar year EA LLP had gross receipts and total income of
7  approximately $6,212,605.

8         ii.   The Peoples Bank 2012 Form 1065 stated that in
9  the 2012 calendar year EA LLP had ordinary business income of
10 approximately $5,819,458, whereas the IRS 2012 Form 1065 stated that
11 EA LLP had an ordinary business loss of approximately $2,128,849.

12        g.    In reliance on the false and fraudulent information
13 defendant AVENATTI submitted to The Peoples Bank in support of the
14 March 2014 EA LLP Loan, on or about March 14, 2014, The Peoples Bank
15 approved the March 2014 EA LLP Loan and transferred approximately
16 $1,824,584 to EA Account 8461.

17        h.    In support of the application for the December 2014 EA
18 LLP Loan, on or about November 16, 2014, defendant AVENATTI submitted
19 to The Peoples Bank a Balance Sheet for January 2014 through
20 September 2014 for EA LLP, which stated, among other things, that EA
21 LLP had approximately $712,729 in EA Account 8461 as of September 30,
22 2014.   In truth and in fact, as defendant AVENATTI then well knew,
23 the balance in EA Account 8461 as of September 30, 2014, was
24 approximately $27,710.

25        i.    In support of the application for the December 2014 EA
26 LLP Loan, on or about November 22, 2014, defendant AVENATTI submitted
27 to The Peoples Bank a personal financial statement as of November 1,
28 2014, in which defendant AVENATTI failed to disclose to The Peoples

1 Bank that defendant AVENATTI still owed the IRS approximately

2 $850,438 in unpaid personal income taxes, plus interest and

3 penalties, for the 2009 and 2010 calendar years.

4       j.  In support of the application for the December 2014 EA

5 LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted

6 to The Peoples Bank a 2012 U.S. Individual Income Tax Return (Form

7 1040) (the "Peoples Bank 2012 Form 1040"), stating that defendant

8 AVENATTI had total income for the 2012 calendar year of approximately

9 $5,423,099, and had paid to the IRS $1,600,000 in estimated tax

10 payments.  In truth and in fact, as defendant AVENATTI then well

11 knew, defendant AVENATTI had not filed the Peoples Bank 2012 Form

12 1040 with the IRS, had not filed any 2012 U.S. Individual Income Tax

13 Return with the IRS, and had not made any payments to the IRS towards

14 his 2012 individual tax liability.

15       k.  In support of the application for the December 2014 EA

16 LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted

17 to The Peoples Bank a 2013 U.S. Individual Income Tax Return (Form

18 1040) (the "Peoples Bank 2013 Form 1040"), stating that defendant

19 AVENATTI had total income for the 2013 calendar year of approximately

20 $4,082,803, and had paid to the IRS approximately $1,250,000 in

21 estimated tax payments and approximately $103,511 in withholdings.

22 In truth and in fact, as defendant AVENATTI then well knew, defendant

23 AVENATTI had not filed the Peoples Bank 2013 Form 1040 with the IRS,

24 had not filed any 2013 U.S. Individual Income Tax Return with the

25 IRS, had not made any estimated tax payments to the IRS towards his

26 2013 individual tax liability, and did not have any tax withholdings

27 during the 2013 calendar year.

28

1.  In order to obtain the December 2014 EA LLP Loan, on or about December 12, 2014, defendant AVENATTI, on behalf of EA LLP, signed a commercial pledge agreement whereby EA LLP agreed to "Assignment of the First $500,000 Plus Interest of Settlement Proceeds in the Meridian related cases, said attorney's fees to be $10.8 million plus out of pocket costs for class counsel [EA LLP]." On or about March 31, 2015, after EA LLP received a $3,034,514 wire transfer from the trustee of the Meridian settlement, defendant AVENATTI concealed and did not disclose, and caused EA LLP to conceal and not disclose, the receipt of the funds to The Peoples Bank, and did not distribute and caused EA LLP not to distribute the first $500,000 to The Peoples Bank as defendant AVENATTI on behalf of EA LLP had agreed to do.

m.  In reliance on the false and fraudulent information defendant AVENATTI submitted to The Peoples Bank in support of the March 2014 EA LLP Loan and the December 2014 EA LLP Loan, on or about December 12, 2014, The Peoples Bank approved the December 2014 EA LLP Loan and transferred approximately $494,500 to EA Account 8461.

## C.  **EXECUTIONS OF THE SCHEME TO DEFRAUD**

47.  On or about the dates set forth below, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown to the Grand Jury, executed the fraudulent scheme by committing and willfully causing others to commit the following acts:

| COUNT | DATE | ACT |
|---|---|---|
| THIRTY | 3/14/2014 | Receipt of March 2014 EA LLP Loan proceeds in the amount of approximately $1,824,584. |

| COUNT | DATE | ACT |
|-------|------|-----|
| THIRTY-ONE | 12/12/2014 | Receipt of December 2014 EA LLP Loan proceeds in the amount of approximately $494,500. |

48

COUNT THIRTY-TWO

[18 U.S.C. §§ 1028A(a)(1), 2(b)]

48.　The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, 38 through 40, and 43 through 46 of this Indictment as though fully set forth herein.

49.　On or about December 1, 2014, in Orange County, within the Central District of California, and elsewhere, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant AVENATTI knew belonged to another person, namely, the name and preparer tax identification number ("PTIN") of M.H., during and in relation to the offense of Bank Fraud, a felony violation of Title 18, United States Code, Section 1344(1), as charged in Count Thirty-One of this Indictment.

COUNT THIRTY-THREE

[18 U.S.C. §§ 152(3), 2(b)]

**A.   INTRODUCTORY ALLEGATIONS**

50.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 of this Indictment as though fully set forth herein.

51.   In or about February 2016, J.F., a former partner at EA LLP, filed an arbitration claim against EA LLP and defendant MICHAEL JOHN AVENATTI ("AVENATTI").   In or about February 2017, the arbitration panel ordered the depositions of defendant AVENATTI and EA Employee 1 to take place on March 3, 2017.

52.   On or about March 1, 2017, a creditor of EA LLP, filed an involuntary Chapter 11 bankruptcy petition against EA LLP in the Middle District of Florida.   By law, the filing of the bankruptcy petition created an automatic stay under Section 362 of Title 11 of the arbitration between J.F. and EA LLP and defendant AVENATTI.

53.   On or about March 8, 2017, in response to an emergency motion filed by J.F. for relief from the automatic stay, the Bankruptcy Court in the Middle District of Florida ordered that unless EA LLP consented to the bankruptcy by March 10, 2017, the Court would grant relief from the automatic stay and thereby allow the arbitration to proceed.

54.   On or about March 10, 2017, EA LLP consented to an order for relief under Chapter 11 of Title 11 and, as a result, EA LLP became a debtor in possession in bankruptcy.

55.   On or about April 11, 2017, defendant AVENATTI certified and declared under penalty of perjury as the managing partner of EA LLP that the United States Trustee Financial Requirements Checklist,

50

1  Certifications, and any Attachments Thereto, were true and correct to
2  the best of his knowledge and belief.  Defendant AVENATTI on behalf
3  of EA LLP further certified that he had "read and underst[ood] the
4  United States Trustee Chapter 11 'Operating Guidelines and Reporting
5  Requirements for Debtors in Possession and Trustees'" and "agree[d]
6  to perform in accordance with said guidelines and requirements."
7  Specifically, defendant AVENATTI certified as the managing partner of
8  EA LLP that he understood, among other things, that EA LLP was
9  required to: (a) close all pre-petition bank accounts controlled by
10  the debtor, EA LLP; (b) immediately open new debtor-in-possession
11  ("DIP") operating, payroll, and tax accounts; and (c) deposit all
12  business revenues into the DIP operating account.

13      56.  On or about April 20, 2017, the EA LLP Chapter 11
14  bankruptcy was transferred from the Middle District of Florida to the
15  Central District of California as In re: Eagan Avenatti LLP, bearing
16  case number 8:17-bk-11961-CB.  In the bankruptcy case, EA LLP was the
17  debtor in possession, and all property and assets in which the debtor
18  had any ownership or interest at the time of the filing of the
19  bankruptcy petition as well as any interest in property that the
20  debtor acquired after the commencement of the bankruptcy case was the
21  "bankruptcy estate," and was under the management and control of the
22  debtor in possession.

23      57.  On or about May 12, 2017, the Office of the United States
24  Trustee in the Central District of California provided defendant
25  AVENATTI the Guidelines and Requirements for Chapter 11 Debtors in
26  Possession (the "Guidelines and Requirements"), which required EA LLP
27  to close all existing bank accounts and open new DIP general,

28

51

1 payroll, and tax bank accounts, and to file a declaration regarding
2 EA LLP's compliance with the Guidelines and Requirements.

3   58.   On or about May 30, 2017, defendant AVENATTI signed under
4 penalty of perjury as the managing partner of EA LLP a "Declaration
5 of Debtor Regarding Compliance with the United States Trustee
6 Guidelines and Requirements for Chapter 11 Debtors in Possession,"
7 which included the following information:

8       a.   Defendant AVENATTI, on behalf of EA LLP, confirmed
9 that EA LLP had closed all pre-petition bank accounts, and provided
10 the account information for EA LLP's three new DIP bank accounts.

11      b.   Defendant AVENATTI, on behalf of EA LLP, provided the
12 United States Trustee with evidence that EA LLP had closed EA LLP's
13 prior general account and opened three new DIP bank accounts.

14      c.   In response to the requirement that EA LLP list the
15 last two years for which EA LLP filed federal and state tax returns,
16 defendant AVENATTI, on behalf of EA LLP, stated that neither "[t]he
17 Debtor nor its accountant has copies of its 2014 and 2015 federal or
18 state income tax returns.  The Debtor will seek to obtain copies of
19 them from the IRS and the State of California."

20   59.   Pursuant to the Guidelines and Requirements, EA LLP had
21 additional and ongoing requirements during the course of the
22 bankruptcy, including the following:

23      a.   Before any insiders, including the owners, partners,
24 officers, directors, and shareholders of EA LLP and relatives of
25 insiders, could receive compensation from the bankruptcy estate, EA
26 LLP was required to provide notice to the creditors and the United
27 States Trustee.  No such compensation could be paid to any insiders
28 until 15 days after service of the notice and (i) no objection had

52

1 been received by the Bankruptcy Court; or (ii) if an objection had

2 been received, the Bankruptcy Court had resolved the objection.

3       b.    EA LLP was required to file Monthly Operating Reports

4 ("MOR") to include, among other things, "information regarding bank

5 accounts over which the debtor ha[d] possession, custody, control,

6 access or signatory authority, even if the account [was] not in the

7 debtor's name and whether or not the account contain[ed] only post-

8 petition income." EA LLP was "required to report all of [its]

9 financial information in the MOR."

10     60.  From on or about May 25, 2017, through on or about February

11 15, 2018, defendant AVENATTI signed under penalty of perjury and

12 filed MORs for EA LLP for eleven months, namely, March 2017 through

13 January 2018, inclusive, which included the following information:

14       a.    The first page of each MOR stated that "All receipts

15 must be deposited into the general account," and required EA LLP to

16 itemize: (i) the beginning balance of the general account for the

17 month at issue; (ii) all receipts EA LLP obtained during the month;

18 (iii) all of the disbursements EA LLP made during the month,

19 including transfers to other DIP accounts; and (iv) the ending

20 balance of the general account for the month at issue.

21       b.    Each MOR required EA LLP to include all receipts and

22 expenditures during the monthly reporting period, as well as the

23 cumulative post-petition amounts. On all eleven MORs that defendant

24 AVENATTI signed under penalty of perjury on behalf of EA LLP,

25 defendant AVENATTI claimed zero payroll was made to insiders.

26 Immediately above the penalty of perjury declaration, each MOR sought

27 answers to several questions, including whether EA LLP provided

28 compensation or remuneration to any officers, directors, principals,

53

1  or other insiders without appropriate authorization during the

2  reporting period.  On all eleven MORs that defendant AVENATTI signed

3  under penalty of perjury on behalf of EA LLP, defendant AVENATTI

4  answered "no" to the question whether any compensation or

5  remuneration was made to any officers, directors, principals, or

6  other insiders.

7  **B.**   **FALSE DECLARATION**

8      61.   On or about June 19, 2017, in Orange County, within the

9  Central District of California, defendant AVENATTI knowingly and

10  fraudulently made and willfully caused to be made a materially false

11  declaration and statement under penalty of perjury within the meaning

12  of Title 28, United States Code, Section 1746, in and in relation to

13  a case under Title 11 of the United States Code, namely, In re: Eagan

14  Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court

15  for the Central District of California, by submitting and declaring

16  under penalty of perjury to be true and complete the Monthly

17  Operating Report for EA LLP for the period May 1, 2017, through

18  May 30, 2017 (the "May 2017 MOR"), in which defendant AVENATTI, as

19  the Managing Partner for EA LLP, falsely stated that EA LLP's

20  "Receipts During Current Period; Accounts Receivable - Post Filing"

21  were $409,953.70, whereas, in truth and in fact, as defendant

22  AVENATTI then well knew, EA LLP's receipts during the May 2017 MOR

23  period, accounts receivable - post filing were greater than

24  $409,953.70.

25

26

27

28

COUNT THIRTY-FOUR

[18 U.S.C. § 152(3), 2(b)]

62.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

63.   On or about October 16, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period September 1, 2017, through September 30, 2017 ("September 2017 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $829,635.28, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the September 2017 MOR period, accounts receivable – post filing were greater than $829,635.28.

COUNT THIRTY-FIVE

[18 U.S.C. § 152(3), 2(b)]

64.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

65.  On or about February 15, 2018, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period January 1, 2018, through January 31, 2018 ("January 2018 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $232,221.11, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the January 2018 MOR period, accounts receivable – post filing were greater than $232,221.11.

COUNT THIRTY-SIX

[18 U.S.C. § 152(2)]

66. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

67. On or about June 12, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made a false oath as to a material matter in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, in that defendant AVENATTI testified under oath at the Section 341(a) debtor's examination and stated "no" when asked whether the debtor, EA LLP, received any counsel fees from the Super Bowl NFL litigation. In truth and in fact, as defendant AVENATTI well knew at the time he made the false oath, defendant AVENATTI and EA LLP had received fees from the Super Bowl NFL litigation, namely, two wire transfers totaling approximately $1,361,000, including attorneys' fees, on or about May 17, 2017.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

68.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One through Ten, Thirty, Thirty-One, or Thirty-Three through Thirty-Six of this Indictment.

69.  Defendant shall forfeit to the United States of America the following:

a.  all right, title, and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, or property traceable to such proceeds; and

b.  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

70.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in

1   value; or (e) has been commingled with other property that cannot be

2   divided without difficulty.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982 and 1028, and 28 U.S.C. §2461(c)]

71. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1028, and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction of the offense set forth in Count Thirty-Two of this Indictment.

72. Defendant, if so convicted, shall forfeit to the United States of America the following:

a. All right, title and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, and any property traceable thereto;

b. Any personal property used or intended to be used to commit the offense; and

c. To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

73. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

60

1   court; (d) has been substantially diminished in value; or (e) has

2   been commingled with other property that cannot be divided without

3   difficulty.

4                                         A TRUE BILL

5

6                                           /S/

7                                       Foreperson

8   NICOLA T. HANNA
     United States Attorney
9

10

11   LAWRENCE S. MIDDLETON
     Assistant United States Attorney
12   Chief, Criminal Division

13   RANEE A. KATZENSTEIN
     Assistant United States Attorney
14   Chief, Major Frauds Section

15   JULIAN L. ANDRÉ
     Assistant United States Attorney
16   Major Frauds Section

17   BRETT A. SAGEL
     Assistant United States Attorney
18   Santa Ana Branch Office

19

20

21

22

23

24

25

26

27

28